Present:   All the Justices

VELOCITY EXPRESS MID-ATLANTIC, INC.

OPINION BY CHIEF JUSTICE LEROY R. HASSELL, SR.
September 12, 2003
v.  Record No. 022877

BRIAN F. HUGEN

FROM THE CIRCUIT COURT OF THE CITY OF PORTSMOUTH
Von L. Piersall, Jr., Judge

I.

In this appeal, the primary issue that we consider is whether the plaintiff's closing argument to the jury deprived the defendant of its right to a fair and impartial trial.

II.

Plaintiff, Brian F. Hugen, was seriously injured in an automobile accident on August 28, 2000.  The accident occurred around 7:00 a.m. on State Route 32 in the City of Suffolk.  Route 32 is a two lane highway that extends in northern and southern directions.  The speed limit is 55 miles per hour.

Michael T. Ross was driving a car in the northern lane of travel.  Plaintiff was driving his car in the same direction behind Ross' vehicle.  Ross observed a white van approaching from the opposite direction.  Defendant, Velocity Express Mid-Atlantic, owned the white van which was operated by its employee, Alvin J. Winston.  The van "drift[ed] over" into Ross' lane of travel.  Trying to avoid a collision, Ross

steered his car "all the way to the shoulder of the road," and defendant's van "sideswipe[d]" Ross' car. Defendant's van then collided with plaintiff's car in plaintiff's lane of travel.

After the accident occurred, Winston told defendant's safety director: "I don't know what happened. Besides me, there were two other vehicles. The next thing I remember was when we got side to side of each other, I heard a mirror go off the van. Then when I went swerving, when I swerved in the wrong lane and hit another car and I tried to hit the brakes and tried to get over, somehow the van wouldn't get over. And then the van hit on the other car driving straight down the lane, other car going the other way." Winston told a police officer at the scene of the accident that Winston "never saw the first vehicle that he collided with."

As a result of the accident, plaintiff sustained catastrophic injuries, and he suffered permanent physical and mental disabilities. Plaintiff was in a coma for 62 days following the accident. He suffered a compression fracture of the thoracic vertebrae, a broken femur, a fractured hip, multiple fractures to his right ankle, collapsed lungs, and severe brain injuries. He experienced multi-system organ dysfunction, acute renal failure, multiple incidents of deep venous thromboses, and pneumonia. He has developed a rare

condition known as heterotopic ossification, which causes abnormal new bone formations and ultimately will cause his joints to fuse together, thereby preventing him from moving his body. The severe stiffness in the joints caused by the heterotopic ossification has almost completely restricted plaintiff's use of his arms, hips, legs, and knees. Eventually, plaintiff will have a total ankylosis or "frozen jaw" that will prohibit him from opening his mouth, and his jaw will become "permanently locked." Plaintiff will lose all his teeth, and he will have to be fed through the insertion of a surgically-implanted tube into his stomach.

Plaintiff's brain injuries have impaired his memory, attention span, and abilities to concentrate, understand, and follow instructions. He ranks in the bottom five percent of the population in terms of his mental functions. As a result of his brain injuries, plaintiff eats excessive quantities of food because he is unable to discern when he is full. Consequently, plaintiff, who weighed approximately 175 pounds before the accident, now weighs 282 pounds. His weight impairs his ability to breathe, adversely affects his heart, and increases the risk of further blood clots.

During a jury trial, plaintiff and defendant relied upon expert witness testimony to establish life care plans that plaintiff will require because of his dire medical condition.

Plaintiff's expert witnesses testified that plaintiff will need the services of a licensed practical nurse 24 hours each day for the remainder of his life. Robert D. Voogt, one of plaintiff's expert witnesses, testified that plaintiff needs the assistance of a licensed practical nurse because this type of nurse can provide the appropriate nursing care that plaintiff currently requires and will require in the future. Defendant's expert witness, Robert H. Taylor, testified that a certified nursing aide, who has less training and is less expensive than a licensed practical nurse, can provide the 24-hour daily care that plaintiff needs. Taylor testified that a certified nursing aide would cost approximately $96,360 per year, which, when added to the other costs, resulted in a life care plan that will cost $4,123,193.50. Plaintiff presented evidence, however, that a licensed practical nurse would cost $425,955 per year, which, when added to other costs, resulted in a life care plan that cost $17,091,000.

The jury returned a verdict in favor of plaintiff in the amount of $60,000,000. The circuit court entered a judgment confirming the verdict and defendant appeals.

## III.

Defendant asserts that the trial court erred in failing to instruct the jury on the defense of sudden emergency. Defendant claims that the van operated by its employee,

4

Winston, was forced into plaintiff's lane of travel when Ross' car collided with defendant's van. We disagree with defendant.

The sudden emergency doctrine relieves a person of liability if, without prior negligence on his part, that person is confronted with a sudden emergency and acts as an ordinarily prudent person would act under the circumstances. See, e.g., Jones v. Ford Motor Co., 263 Va. 237, 262, 559 S.E.2d 592, 605 (2002); Bentley v. Felts, 248 Va. 117, 120, 445 S.E.2d 131, 133 (1994); Carolina Coach Co. v. Starchia, 219 Va. 135, 141, 244 S.E.2d 788, 792 (1978); Pickett v. Cooper, 202 Va. 60, 63, 116 S.E.2d 48, 51 (1960); Southern Passenger Motor Lines, Inc. v. Burks, 187 Va. 53, 60, 46 S.E.2d 26, 30 (1948).

Additionally, we have stated:

> "Ordinarily the question of application of the sudden emergency doctrine is for the triers of fact. When evidence is conflicting or different inferences may be drawn from the evidence, it is for the jury to say (1) whether [the operator of the automobile] was confronted with an emergency; (2) whether the emergency, if one existed, was created by [the operator's] own negligence; and (3) whether [the operator of the vehicle] conducted himself as an ordinarily prudent person might have done under the same or similar circumstances."

Cowles v. Zahn, 206 Va. 743, 746-47, 146 S.E.2d 200, 203 (1966); accord Ford Motor Co., 263 Va. at 262, 559 S.E.2d at 605; Starchia, 219 Va. at 141, 244 S.E.2d at 792.

5

In the present case, the circuit court correctly concluded that defendant was not entitled to a jury instruction on the sudden emergency doctrine. The accident was caused by the negligence of defendant's own employee. For example, Ross, the driver of the car that collided with defendant's van before that van collided with plaintiff's car, testified as follows:

> "Q: Okay. Now, in your own words tell the members of the jury what happened from the time you observed the van.
>
> "A: Well, from the time I observed the van I noticed that [Velocity's van] was kind of drifting over to my lane. And I went over to the shoulder to try to avoid a collision, and it never worked. You know, he got far enough over where he hit me, and I went off the road, lost control.
>
> . . . .
>
> "Q: How much of the van came into your lane, from your observation?
>
> "A: From my observation I would say over half."

And, contrary to defendant's assertions, the evidence of record clearly demonstrates that the accident occurred in the lane of travel occupied by Ross and plaintiff. Simply stated, a sudden emergency did not exist.

IV.

A.

6

Plaintiff's counsel made the following remarks during his closing argument to the jury:

"The physical pain and mental anguish [plaintiff] suffered in the past and any that he may reasonably be expected to suffer in the future. We men are a proud lot at times probably to our detriment on occasion and sometimes our pride gets in our way. It is inconceivable to me that a man who cared for himself, who cared for his family, who on his wedding day to help his wife took her to Williamsburg in lieu of a trip to the islands so that she could be near her mother who was seriously and mentally ill at that point in time, a man who has taken care of himself and his family all of his life, a man who is basically now reduced to a role reversal. That is what has happened here, a complete, unequivocal role reversal.

"He can't perform sexually. Can't imagine what that is like. He can't basically do anything for himself. If you sit there by yourself with your arms still seated in a chair and just don't move -

"[COUNSEL FOR DEFENDANT]: Your Honor, I am going to object to that argument as being in violation of the golden rule, Your Honor.

"[COUNSEL FOR PLAINTIFF]: I will rephrase it to avoid any problem.

"THE COURT: You can't put the jury in that position.

. . . .

"[COUNSEL FOR PLAINTIFF]: [Velocity Express] can't find a doctor. But they don't want a doctor. They want a miracle. Just like the happening of this accident. No amount of witnesses would satisfy Velocity Express. You could have four bishops on the side of the road watching what is going on and they still could claim somehow it wasn't their fault.

"Ladies and gentlemen, it is all well and good that Corporate America balances the books and tries to make a profit. That is the American way, isn't it? But you cannot balance the books on the backs of the injured. You can't take a little man like this, injure him horribly, and then try to save money by a cheap life care plan.

"This guy Taylor they bring down here even - he can't fuss with the fact that Brian [Hugen] needs somebody 24 hours a day. Yet, what he wants to do is he doesn't want to give him a nurse. He wants to give him an aide. But he has to concede that the aide, which costs about [$]100,000 - the numbers are here somewhere - a year, if they gave him the nurse, the nurse would cost 394-. So what have you got? $500,000 a year. That would be the two combined. So that would save $400,000 a year that Velocity itself says would have to be spent.

"Well, let me ask you all something. Suppose money were no object in this case and we didn't have Brian Hugen here. Let's say we have a man - a wealthy man, a man of means who could afford whatever he wants to. Suppose this had happened to them, Howard Hughes, Bill Gates, somebody like that. Suppose they were laying up in the condition Brian [Hugen] was. Do you think they would have one little aide? You don't think they wouldn't have an aide, a nurse, and whatever else it took to make their life as good as it possibly could?

"[COUNSEL FOR DEFENDANT]: Your Honor, I am going to object to this argument, as well. It is improper. The plaintiff in the case is Brian Hugen. It is not Bill Gates. It is not anyone else. It is improper argument. There has been no evidence about what those individuals would expect, not even a reasonable inference.

"THE COURT: Overruled.

"[COUNSEL FOR PLAINTIFF]: So we get the discount plan. We are going to balance the books. So who is the economic well spring here? Who is providing Velocity Express with this big savings? I don't see her here in the courtroom. Her name is

8

Florence Hugen.  So you forgive me if I am a bit sarcastic, but Mr. Taylor's plan, I don't call that the Taylor plan[,] I call that the Flo plan because they are going to have Flo do everything that the nurse is supposed to do.

"Now, they give an aide in there.  And I don't know a lot about aides but let me ask you something.  Suppose something goes south for Brian?  Who would you want in the house?  And I am not talking about giving pills.  Because Mr. Train wants you to believe that the only thing the nurse would do is give pills.  Let me ask you.  Suppose your husband were choking to death and he couldn't open his mouth?  Do you want an aide trying to get your husband's throat clear or would you like to have a nurse -

"[COUNSEL FOR DEFENDANT]:  Again, Your Honor.

"[COUNSEL FOR PLAINTIFF]:  - while you're at work?

"THE COURT:  I think it is not appropriate to ask the jurors to put themselves in the place of the party.

"[COUNSEL FOR PLAINTIFF]:  And I apologize.  If you can imagine you're responsible for a person.  Don't imagine your family members.  That was an improper question.  And I perhaps in my enthusiasm or whatever you want to call it I misspoke.  I do apologize to you.  And Mr. Train's objection is well taken.  I apologize, Mr. Train, and Velocity.  But if you were responsible for someone, who would you want there?

"[COUNSEL FOR DEFENDANT]:  Same objection, Your Honor.  It is the same - I mean, you can't appeal to the jury.  You can't place the jury -

"[COUNSEL FOR PLAINTIFF]:  The idea of responsibility, Your Honor.

"THE COURT:  I hate to interrupt the party when they are making their closing argument.

9

"[COUNSEL FOR DEFENDANT]:  I do, too.

"THE COURT:  The jurors shouldn't be asked to be put in the place of the parties.

"[COUNSEL FOR PLAINTIFF]:  You know, [Dr.] Kreutzer's plan that he did for Brian, that is no Cadillac plan.  I mean, you are not talking about a registered nurse.  You are just talking about a licensed practical nurse.  He doesn't have any money folded in for contingencies.  I mean, there is not a nickel in there for any of that.  I mean, it is not -- it is not some fluffed-up plan like the defense would have you believe.  It is just basically what is needed.

"If, for example, if - suppose an individual were charged with the care of someone's, let's say, child or something like, this an eight-year-old child.  And you had to pick an attendant for that child at the home while you were away.  If the attendant was not qualified - and I am - I am talking about a child who can go to the kitchen to make a sandwich, go [to] the bathroom, run out of the house if there is a fire, things Brian can't do. If something happened to that child and you were responsible for selecting the attendant, social services would be coming all out the woodwork on top of you.  And that is a big -

"[COUNSEL FOR DEFENDANT]:  Your Honor, I object.  I try not to interrupt, as well.  But he keeps arguing if you are talking to the jury.

"THE COURT:  I think in that case it was not [in]appropriate.  I will overrule it."

(Emphasis added).

At the conclusion of the plaintiff's argument to the jury, counsel for the defendant made a motion for a mistrial based upon plaintiff's cumulative improper and prejudicial arguments to the jury.  The court denied the motion.

10

Defendant argues that the circuit court erred in denying the motion for a mistrial. Defendant contends that the circuit court erroneously overruled defendant's objections to plaintiff's references in closing argument to Howard Hughes and Bill Gates. Defendant also contends that plaintiff improperly and repeatedly requested that the jury place itself in plaintiff's position, thus wrongly invoking the "Golden Rule" despite the court's repeated instructions to counsel not to do so.

Responding, plaintiff asserts that the circuit court correctly denied defendant's motion for a mistrial. Plaintiff alleges that his references to Howard Hughes and Bill Gates were permissible to illustrate that "defendant's life care plan focused on cutting costs and not the plaintiff's medical needs." Plaintiff claims that his closing argument regarding the need for a licensed practical nurse did not improperly invoke the "Golden Rule." We disagree with plaintiff.

The principles we apply when considering whether a circuit court erred in denying a mistrial based on statements made by counsel in closing argument are well established. Generally, a new trial is not required if the circuit court sustains an objection to improper argument and instructs the jury to disregard the improper argument. However, if "counsel

11

persists in such argument after the admonition of the court, or if it appears that the [prejudicial] influence of the argument was probably not wholly removed by the court's action" a new trial may be appropriate.  Maxey v. Hubble, 238 Va. 607, 614-15, 385 S.E.2d 593, 596 (1989) (quoting Rinehart & Dennis Co. v. Brown, 137 Va. 670, 676, 120 S.E. 269, 271 (1923)); Kitze v. Commonwealth, 246 Va. 283, 288, 435 S.E.2d 583, 585 (1993); Norfolk Southern Railway Co. v. Harris, 190 Va. 966, 975, 59 S.E.2d 110, 114 (1950).  If the objection to the alleged improper argument is not sustained by the circuit court, a new trial is appropriate if that court erred in overruling the objection and that error resulted in prejudice to the complaining party.  Reid v. Baumgardner, 217 Va. 769, 775, 232 S.E.2d 778, 781 (1977); McLane v. Commonwealth, 202 Va. 197, 205, 116 S.E.2d 274, 280-81 (1960).  The closing argument in this case includes argument to which objections were sustained and argument to which an objection was overruled.

We will first consider whether the circuit court erred in overruling defendant's objection to plaintiff's closing argument that, in effect, suggested to the jury that it award plaintiff damages that would permit him to procure the services of a licensed practical nurse because wealthy persons such as Howard Hughes or Bill Gates would procure the services

12

of a licensed practical nurse if they had incurred plaintiff's injuries.

In <u>Atlantic Coast Realty Co. v. Robertson's Ex'r</u>, 135 Va. 247, 263, 116 S.E. 476, 481 (1923), we discussed the wide latitude accorded lawyers during closing argument:

> "[An attorney] must be just to opposing litigants and witnesses and always respect their rights. His liberties in argument are large but they are not unlimited. He has no right to testify in argument nor to assume that there is evidence which has no existence, nor to urge a decision which is favorable to his client by arousing sympathy, exciting prejudice, or upon any ground which is illegal. Sometimes the impropriety is so serious in character that its evil effect cannot be corrected by the trial judge. If this ethical rule . . . is not sufficient to control those who fail to observe it, the courts, however reluctant they may be to limit the freedom of discussion, or to penalize a litigant for the transgression of his attorney, will be forced to curb this growing evil."

We stated, almost 100 years ago, that counsel in closing argument must not appeal to the economic fears and passions of a jury and that such argument constitutes reversible error. <u>Southern Ry. Co. v. Simmons</u>, 105 Va. 651, 666-67, 55 S.E. 459, 464 (1906). In <u>Simmons</u>, counsel for the defendant, in closing argument,

> "expressed the fear that the railroad employees who had testified against the company would lose their places, although there was no evidence on this point; that counsel for the railroad company rode in private and palace cars when they came to court, although there was no evidence on this point; that the mind could not grasp the extent of the resources and possessions of the Southern Railway Company,

13

while [the plaintiff] was a poor man with nobody but his wife and child, and with no one to help him but his wife; that the treasury of the railway company was so exhaustless that it would hardly feel the loss of $50,000, the amount claimed in the declaration; and that in estimating damages [the jury] should take into consideration the fact that exceptions had been taken by the defendant, and that it had been stated that if the verdict was against it, it would appeal."

Id. at 665-66, 55 S.E. at 464. We concluded that "[s]uch a line of argument, if proper objection be made to it at the proper time and the trial court fails to take proper steps to correct its ill tendencies, will constitute a sufficient ground for reversing a judgment rendered upon a verdict thus obtained." Id. at 666-67, 55 S.E. at 464.

In Baumgardner, counsel for the defendant objected to the plaintiff's improper jury argument that asked a jury to award a verdict that included as damages $1,000 for each of the plaintiff's 28.7 years of life expectancy as established by an annuity table. The circuit court overruled the objection. Reversing the judgment of the circuit court, we held:

"The decision of the trial court as to the method by which to remove the prejudicial effect of improper argument is within its sound discretion, and an admonition to the jury to disregard such argument is generally deemed to have been sufficient and not to have been an abuse of the trial court's discretion. . . . However, if the trial court refuses to take any corrective action to eliminate the adverse effect on the jury of improper argument, the probability of prejudice is increased by the apparent approval given by the court to the argument."

14

217 Va. at 774, 232 S.E.2d at 781.

Applying our well-established precedent, we hold that the circuit court erred in failing to grant the defendant's motion for a mistrial. As we have already stated, plaintiff's counsel made the following argument to the jury:

> "Suppose money were no object in this case and we didn't have Brian Hugen here. Let's say we have a man - a wealthy man, a man of means who could afford whatever he wants to. Suppose this had happened to them, Howard Hughes, Bill Gates, somebody like that. Suppose they were laying up in the condition Brian was. Do you think they would have one little aide? You don't think they wouldn't have an aide, a nurse, and whatever else it took to make their life as good as it possibly could?"

Defendant timely objected to this argument, and the circuit court overruled the objection. This argument was improper because plaintiff's counsel asked the jury to award damages based upon irrelevant economic considerations that are not part of the record in this case. The above-referenced portion of plaintiff's closing argument asked the jury to award damages to the plaintiff so that he could afford the same quality of medical care and treatment that the world's richest individuals might purchase for themselves. The law of this Commonwealth, however, only requires that a jury award plaintiff compensatory damages that will fairly compensate him for his injuries proximately caused by defendant's negligence.

15

The probable prejudicial impact of this argument is significant because the improper argument focused on the central dispute regarding damages in this case. As we have already stated, the defendant presented evidence that the plaintiff only required the services of a certified nursing aide who would cost approximately $96,360 per year, which, when added to other related costs, resulted in a life care plan that totaled $4,123,193.50. In direct conflict, however, plaintiff presented evidence that he required the services of a licensed practical nurse who would cost $425,955 per year, which, when added to the rest of his medical plan, represented a total cost of $17,091,000. Plaintiff's improper jury argument was designed to influence the jury's decision regarding this choice. The circuit court refused to take any corrective action to eliminate the adverse prejudicial effect on the jury of plaintiff's improper argument. Based upon the record before this Court, we conclude that the probability of prejudice upon the jury was great and such prejudice was increased by the apparent approval given by the circuit court because of that court's refusal to take corrective action.

We also consider whether the circuit court erred by refusing to grant defendant's motion for a mistrial because plaintiff improperly and repeatedly requested that the jury place itself in plaintiff's position, thus, invoking the

16

"Golden Rule" despite the court's repeated instructions to plaintiff's counsel that he not do so.

We have repeatedly held that counsel may not, in closing argument, invoke the so-called "Golden Rule."  "The function of the jury is to decide according to the evidence, not according to how its members might wish to be treated." Seymour v. Richardson, 194 Va. 709, 715, 75 S.E.2d 77, 81 (1953); accord P. Lorillard Co. v. Clay, 127 Va. 734, 752, 104 S.E. 384, 390 (1920).  See also Norfolk & W. Ry. Co. v. Keatley, 211 Va. 507, 511, 178 S.E.2d 516, 519 (1971); State Farm Mut. Auto. Ins. Co. v. Futrell, 209 Va. 266, 272-73, 163 S.E.2d 181, 186 (1968); Phillips v. Fulghum, 203 Va. 543, 547-49, 125 S.E.2d 835, 838-40 (1962); Cape Charles Flying Serv., Inc. v. Nottingham, 187 Va. 444, 455-56, 47 S.E.2d 540, 545-46 (1948); Crosswhite v. Barnes, 139 Va. 471, 486-87, 124 S.E. 242, 247 (1924).

In Rinehart & Dennis Co. v. Brown, 137 Va. 670, 676, 120 S.E. 269, 271 (1923) (citing Washington & Old Dominion Ry. v. Ward, 119 Va. 334, 339, 89 S.E. 140, 142 (1916)), we stated:

> "Generally a new trial will be denied [when] improper argument has been checked by the court and the jury has been instructed to disregard the improper statements.  If, however, counsel persists in such argument after the admonition of the court, or if it appears that the unfavorable influence of the argument was probably not wholly removed by the court's action, a new trial may be allowed."

17

In *Virginia Elec. & Power Co. v. Jayne*, 151 Va. 694, 144 S.E. 638 (1928), we reversed a judgment in favor of a plaintiff because his counsel continued to make improper argument in spite of the circuit court's admonitions. Counsel in *Jayne* stated to the jury: "How long will the defendant company shed its tears after this trial is over? Do you suppose its tear duct has been hurt any?" The circuit court directed the jury to disregard these remarks and, subsequently, counsel stated to the jury: "That is just a figure of speech. You know corporations haven't any tear ducts." The circuit court instructed the jury to disregard this remark as well. *Id.* at 703, 144 S.E. at 641.

We concluded that these remarks were improper and prejudicial, and we reversed the judgment that confirmed the jury's verdict. We stated:

> "Litigants can have no just grounds for complaint if verdicts obtained under such circumstances are set aside. To require counsel to confine their discussions before the jury to the law and the evidence is no hardship, but is in furtherance of justice, and of the prompt disposition of controversies based upon the law and the evidence, subjected of course to any fair analysis or criticism, which the ingenuity of counsel may devise."

*Id.* at 704, 144 S.E. at 641.

Applying the aforementioned principles, we must conclude that plaintiff's repeated requests to the jury that it apply

18

the "Golden Rule" were prejudicial and constitute reversible error. As we have previously stated, plaintiff argued to the jury: "Suppose your husband were choking to death and he couldn't open his mouth? Do you want an aide trying to get your husband's throat clear or would you like to have a nurse . . . while you're at work?" The defendant objected, and the circuit court stated: "I think it is not appropriate to ask the jurors to put themselves in the place of the party." Plaintiff apologized, but immediately he argued to the jury: "But if you were responsible for someone, who would you want there?" The defendant objected, and the circuit court again responded: "The jurors shouldn't be asked to be put in the place of the parties."

Even though the circuit court properly sustained most of the objections, plaintiff's counsel continued to invoke the "Golden Rule" during closing argument. This argument was highly prejudicial because plaintiff repeatedly asked the jury, despite the circuit court's admonitions, to assess his damages in relation to how the jurors would want to be compensated personally had they been injured and sustained the same injuries that plaintiff had sustained. And, even though plaintiff's counsel acknowledged to the circuit court that his use of the "Golden Rule" was improper, he continued to engage in this prejudicial argument. Moreover, plaintiff's repeated

use of the "Golden Rule" was also highly prejudicial because this argument was designed to influence the jury's decision whether to base its verdict upon plaintiff's proposed life care plan that cost $17,091,000 instead of defendant's life care plan for plaintiff that cost $4,123,193.50.

C.

Generally, when a litigant makes a prejudicial closing argument to a jury in a non-bifurcated trial, the appropriate remedy is to award a new trial on all issues.  In this case, however, the evidence overwhelmingly supports a finding of liability.  Thus, we hold that the prejudice caused by the improper jury argument, which involved the conflicting evidence about plaintiff's future medical care, could not have affected the jury's findings of negligence.  Therefore, a new trial on all issues is not appropriate.  Because this case will be remanded for a new trial on damages, we must consider certain issues that probably will arise upon remand.

V.

Defendant argues that the circuit court erred by refusing to permit defendant to introduce evidence of plaintiff's history of crack cocaine use, depression, and short-term memory loss one year before the accident.  Continuing, defendant contends that the circuit court erred by refusing to permit defendant to cross-examine plaintiff's expert witnesses

regarding plaintiff's "pre-accident use of crack cocaine and its effect on his post-accident condition" and plaintiff's "pre-accident bouts of depression and [their] relationship to his post-accident claims for depression."

During the trial, plaintiff sought damages for cognitive and emotional injuries he sustained as a result of the accident, including memory loss and depression. Dr. William M. Bethea described plaintiff's emotional instability and depressive condition. Dr. Bethea also testified that plaintiff suffered from short-term memory loss. Dr. Jeffrey S. Kreutzer, a neuropsychologist, described plaintiff's range of post-accident cognitive defects, including his loss of memory and ability to concentrate.

Dr. Bethea testified, outside the presence of the jury, as follows:

> "Q: Doctor, can . . . the habitual use of crack cocaine cause memory loss?
>
> "A: [Counselor,] I would like to make it very clear that when I answer this question, I think it has absolutely nothing to do with this situation based upon the circumstances in which I have cared for him over the last year - Mr. Hugen over the past year. The answer would be yes.
>
> . . . .
>
> "Q: Dr. Bethea, if I insinuated that it was my position that [plaintiff] had been using drugs since the accident, I apologize. That is certainly not what I am trying to say or insinuate in any way, shape, or form.

21

"A: I just want to make it very clear that all of those things that I have testified to in terms of my assessment of the [plaintiff's] present set of circumstances would have absolutely nothing to do with prior . . . drug use.

. . . .

"Q: And [plaintiff] has short-term memory loss, correct?

"A: Brian Hugen was deficient in a brain-injury pattern not a drug-injury pattern."

This Court has consistently stated that "cross-examination on a matter relevant to the litigation and put in issue by an adversary's witness during a [trial] is not a privilege but an absolute right." Basham v. Terry, 199 Va. 817, 824, 102 S.E.2d 285, 290 (1958); accord Food Lion, Inc. v. Cox, 257 Va. 449, 450, 513 S.E.2d 860, 861 (1999); Miller v. Commonwealth, 153 Va. 890, 895-96, 149 S.E. 459, 460 (1929).

However, evidence sought to be elicited during cross-examination must be relevant. "Evidence is relevant if it tends to prove or disprove, or is pertinent to, matters in issue." Clay v. Commonwealth, 262 Va. 253, 257, 546 S.E.2d 728, 730 (2001); Boggs v. Commonwealth, 199 Va. 478, 486, 100 S.E.2d 766, 772 (1957). We have stated that "[e]very fact, however remote or insignificant, that tends to establish the probability or improbability of a fact in issue is relevant."

22

*Virginia Elec. & Power Co. v. Dungee*, 258 Va. 235, 260, 520

S.E.2d 164, 179 (1999); *Ravenwood Towers, Inc. v. Woodyard*,

244 Va. 51, 56, 419 S.E.2d 627, 630 (1992).

Based upon the record before this Court, we conclude that the circuit court properly refused defendant's attempt to cross-examine plaintiff's expert witness on plaintiff's prior drug use because that evidence was not relevant. There is no evidence that plaintiff's brain injury or depression was caused by or related to drug use. Therefore, evidence of the plaintiff's prior use of cocaine or his depression could not "prove or disprove" matters in issue. For example, Dr. Bethea's testimony, proffered by defendant, established that plaintiff's injuries were not caused by drug use. Moreover, Dr. Kreutzer testified, outside the presence of the jury, that "[t]here's no indication in [plaintiff's medical] record that this man suffered medically, neurologically, as a consequence of drug or alcohol use."

Even though Dr. Bethea agreed, outside the presence of the jury, that crack cocaine could cause short-term memory loss, Dr. Bethea testified without equivocation that plaintiff's condition was not related in any way to drug use. Dr. Bethea also testified, outside the presence of the jury, that plaintiff's condition was so devastating that any emotional instability that occurred in past years would have

23

had no effect on his current condition. Additionally, we note that the circuit court permitted defendant to cross-examine Dr. Bethea and elicit testimony of complaints that plaintiff made about depression one year before the accident. Simply stated, defendant does not have an absolute right to cross-examine a witness about evidence that is not relevant.

## VI.

Defendant argues that the circuit court improperly limited its cross-examination of Dr. Kreutzer regarding plaintiff's pre-injury depression. Defendant contends that Dr. Kreutzer's records show that plaintiff had told him of "a two-year history of untreated depressive episodes." Defendant states that Dr. Kreutzer testified that plaintiff "had been treated successfully for depression and that his depression had resolved several years before this accident." However, defendant says that medical records indicate that plaintiff experienced symptoms of depression as recently as one year before the accident and that Dr. Kreutzer's testimony was apparently false.

We hold that the circuit court did not err in limiting the scope of the cross-examination. As plaintiff correctly points out, plaintiff objected to defendant's cross-examination of Dr. Kreutzer on the basis that it was beyond the scope of direct examination. Plaintiff stated, in his

objection, that "[t]here was not a single question and/or answer elicited from this witness with regard to any diagnosis of depression."  Dr. Kreutzer did not testify on direct examination about a diagnosis or subjective complaint of depression made by the plaintiff either before or after the accident and, therefore, the circuit court properly sustained the objection.

VII.

In view of our holdings, we do not consider defendant's remaining assignments of error.  We will remand this case for a new trial solely on the issue of damages.

Affirmed in part,<br>
reversed in part,<br>
and remanded.