PRESENT: All the Justices

BRYAN K. GRAHAM

v.   Record No. 082292                          OPINION BY
                                        JUSTICE BARBARA MILANO KEENAN
                                             September 18, 2009
RANDOLPH B. COOK, ET AL.

                FROM THE CIRCUIT COURT OF LOUDOUN COUNTY
                       James H. Chamblin, Judge


        In this medical malpractice action, we consider whether the

circuit court erred 1) in permitting the defendants to present

certain evidence from the plaintiff's treating physicians; 2) in

precluding certain cross-examination of a treating physician by the

plaintiff; and 3) in limiting the plaintiff's closing argument

regarding x-rays that were admitted into evidence.

        In June 2004, Bryan K. Graham fell from the second story roof of

his home, injuring his left hip.  Graham sought medical treatment

that same day at an urgent care clinic, where a physician determined

that Graham had a sprained hip and recommended that he use crutches

and take pain medication and muscle relaxants.

        About one month later, when Graham's hip pain persisted, he

consulted Dr. Randolph B. Cook, an orthopaedic surgeon.  Dr. Cook

ordered x-rays of Graham's hip and diagnosed Graham as having a

fracture of the left hip socket.  In August 2004, Dr. Cook surgically

repaired the fracture by installing a reconstruction plate secured by

several screws.

After this surgery, Graham continued to experience significant hip pain. During the following two months, he returned three times to Dr. Cook, who ordered multiple x-rays and a CT scan of Graham's hip. After reviewing the x-rays, Dr. Cook initially concluded that either one of the screws from the reconstruction plate was "eroding through the bone," or that Graham was developing early avascular necrosis, bone death caused by a lack of blood supply. Dr. Cook later reviewed the CT scan and stated in his report that the "femoral head"[1] was developing avascular necrosis that was unrelated to the possibility of a screw entering the hip joint. Dr. Cook also stated in his report that he advised Graham that this femoral defect might require joint replacement surgery.

Graham sought the advice of four additional orthopaedic surgeons before making a treatment decision. One of these physicians, Dr. Nigel M. Azer, reviewed Graham's CT scans and x-rays, and concluded that "the second most superior screw" was "intraarticular," meaning that it protruded into the joint space, and had "eroded the femoral head." In February 2005, Dr. Azer performed surgery to remove the suspected intraarticular screw. About seven months later, in September 2005, Dr. Thomas P. Gross performed left hip resurfacing surgery to repair the damage to Graham's femoral head.

---

[1] The femur is the bone that extends from the pelvis to the knee. The ball-like "head" of the femur forms the hip joint with the acetabulum, the cup-shaped socket of the hip bone. Richard Sloane, The Sloane-Dorland Annotated Medical-Legal Dictionary 5, 64, 281 (1987).

In September 2006, Graham filed a complaint alleging medical negligence against Dr. Cook and his practice group, Center for Advanced Orthopedic Surgery & Pain Management, PLC (collectively, Dr. Cook). Graham alleged that Dr. Cook negligently caused a screw to be placed into Graham's left hip joint. Graham alleged that this intraarticular screw caused the erosion of the femoral head that resulted in the hip resurfacing surgery performed by Dr. Gross. Graham sought damages for past and future medical expenses, permanent hip damage, and pain and suffering.

At trial, Dr. Cook presented evidence to support his theory that the damage to Graham's femoral head resulted from avascular necrosis. When Dr. Cook presented the videotaped deposition testimony of Dr. Gross, Graham objected to a portion of the videotape in which Dr. Gross read the following statements from his operative report:

> On the femoral side, I did not see any gouging of the femoral head from any hardware. There was a large area of collapse of the femoral head. [Graham] clearly had Stage III avascular necrosis as his major problem.

Graham argued that these statements were inadmissible because they expressed medical opinions that were not stated within a reasonable degree of medical probability as required by Code § 8.01-399(B).

Dr. Cook responded that the challenged statements merely expressed Dr. Gross' observations that were made during surgery and were recorded contemporaneously in his operative report. However, Dr. Cook contended that even if the disputed statements constituted

3

medical opinions as Graham argued, they were opinions held within a reasonable degree of medical probability. Dr. Cook maintained that this standard was satisfied when, at the outset of Dr. Gross' deposition testimony, Dr. Cook's counsel instructed Dr. Gross to express only those opinions that he held within a reasonable degree of medical probability.

The circuit court ruled that Dr. Gross' statement regarding the femoral head was "more than an observation" but held that the preliminary colloquy satisfied the requirements of Code § 8.01-399(B). On this basis, the circuit court allowed that portion of Dr. Gross' testimony to be presented to the jury.

Dr. Cook also presented testimony from two of Graham's treating radiologists. Dr. Christopher K. Grady testified regarding his review of x-rays of Graham's hip that were taken in August 2005, after removal of the screw by Dr. Azer and before the hip resurfacing surgery by Dr. Gross. During this deposition testimony, Dr. Grady read from his written report, which included the following statement in a section entitled "Findings:"

> There is flattening and small defects in the upper lateral aspect of the left femoral head which could be posttraumatic with superimposed osteoarthritis and subchondral cysts/sclerosis. The possibility of avascular necrosis is not excluded. (emphasis added)

Dr. Grady's report also stated, in a section entitled "Impression:"

> Mild lateral subluxation of the left femoral head and mild-moderate osteoarthritis in the left hip.

4

> Flattening of the superolateral left femoral head
> could also be related to prior trauma and degenerative
> change but <u>avascular necrosis cannot be excluded</u>.
> (emphasis added)

Graham objected to the admission of these portions of the report and to Dr. Grady's deposition testimony regarding avascular necrosis.

Graham argued that avascular necrosis is a medical diagnosis that must be made within a reasonable degree of medical probability under Code § 8.01-399(B). Graham maintained that Dr. Grady's report merely stated "possibilities," rather than opinions held within a reasonable degree of medical probability. Thus, Graham argued, Dr. Grady's report and the proffered testimony were inadmissible because they were irrelevant. The circuit court overruled Graham's objections and admitted both the report and the deposition testimony.

Graham also objected to portions of the trial testimony of Dr. Philip Man, a radiologist who interpreted Graham's September 2004 CT scan. Dr. Man stated in his report, in a section entitled "FINDINGS:"

> There is a defect in the anterior aspects of the
> femoral head associated with cortical irregularities
> as well as diffuse demineralization involving the
> femoral head. <u>This raises the suspicion for avascular
> necrosis</u>. (emphasis added)

Under a section entitled, "IMPRESSION," the report stated:

> 2. Bony defect now seen involving the anterior aspect
> of the femoral head associated with cortical
> irregularities and demineralization <u>suggesting
> fracture and avascular necrosis</u>. (emphasis added)

5

Graham objected to Dr. Man testifying regarding these aspects of his report, asserting that Dr. Man had stated a diagnosis of avascular necrosis but had not expressed this conclusion within a reasonable degree of medical probability.

Outside the presence of the jury, the parties conducted a voir dire of Dr. Man. Dr. Man testified that his report included impressions held within a reasonable degree of medical probability. On cross-examination by Graham, Dr. Man conceded that avascular necrosis was "one of the many causes for the radiographic findings as described." On redirect examination, Dr. Man further explained that he was merely "trying to report the findings," and that avascular necrosis cannot be diagnosed based solely on the results of a CT scan.

The circuit court overruled Graham's objection stating,

We'll let the jury decide. We'll let Dr. Man testify. You can cross-examine him all you want. I think this might be characterized as an observation as opposed to a diagnosis.

The circuit court also admitted Dr. Man's September 2004 report into evidence.

Graham raised an additional objection to testimony by Dr. Man regarding his habit or routine of checking for intraarticular hardware when interpreting CT scans. The circuit court conducted a bench conference during which the parties had the following exchange with the court:

[COUNSEL FOR GRAHAM]: There is nothing in the radiology report regarding hardware, period. . . .

[COUNSEL FOR COOK]: As [Counsel for Graham] knows from the discovery deposition, the witness will testify, has testified that he has a regular habit, routine or practice when he does CT scans of the hip. . . . that includes looking for metallic fragments in the joint. [Code §] 8.01-397 allows a physician witness to . . . rely upon his habit, routine or practice and to establish that his actions on a given date were in accordance or conformance with that habit, routine, or practice, and that's by statute.

. . . .

[COUNSEL FOR GRAHAM]: That would be an opinion that's not been designated.

THE COURT: How about being honest with these people over here and tell them that was his routine to look. He says that that's his routine, he does not have any specific recollection of doing it and it's not in his report one way or the other, and let the jury decide.

[COUNSEL FOR GRAHAM]: I don't have a problem with that.

Dr. Man later testified that in interpreting a CT scan of a joint, radiologists routinely check for hardware in the joint. Dr. Man stated that he had no reason to think that he deviated from this routine practice in reviewing Graham's CT scan from September 2004. Dr. Man explained that had he observed any hardware in the joint, he would have indicated that finding in his report. Dr. Man further testified that he knew that he looked for hardware in the hip joint because his report stated, "No definite loose bodies are identified."

7

During cross-examination of Dr. Man, Graham's counsel identified certain CT scans and anatomical drawings. He asked Dr. Man whether these items indicated the presence of an intraarticular screw, and what written notations Dr. Man would have made if he had found such a screw. Dr. Cook objected to this line of questioning on the ground that Graham was seeking to elicit a "present-day" opinion of the scans and drawings. Dr. Cook argued that Graham effectively was seeking an expert opinion from Dr. Man, who had not been designated as an expert witness. The circuit court sustained Dr. Cook's objection and limited Graham's cross-examination to Dr. Man's report of September 2004, which Dr. Man had prepared contemporaneously with his interpretation of Graham's CT scan.

At the conclusion of the evidence, counsel made closing arguments. Graham's counsel invited the jury to examine the x-rays of Graham's hip that had been admitted into evidence, and argued that the jury could compare the various x-rays and measure the growth of the defect in the femoral head. Dr. Cook objected, stating that because the record contained no evidence that the several x-rays were taken using the same magnification, they could not be compared in the manner suggested by Graham's counsel. Dr. Cook further asserted that the jury must rely on expert testimony to determine "those things medical in the case." The circuit court sustained Dr. Cook's objection.

The jury returned a verdict in favor of Dr. Cook, and the circuit court entered final judgment in accordance with the jury verdict.  Graham appeals.

In his first assignment of error, Graham argues that the circuit court erred when it permitted Dr. Grady and Dr. Man to express medical opinions that were not stated within a reasonable degree of medical probability.  Graham further contends, with regard to Dr. Gross' testimony, that the preliminary directive by Dr. Cook's counsel that Dr. Gross state only those opinions held within a reasonable degree of medical probability, was insufficient to establish a foundation for the admission of his testimony regarding avascular necrosis and the absence of femoral head gouging.  Graham asserts that because Dr. Gross merely was asked to read from his operative report, he would not necessarily have been aware whether his response would have constituted the expression of a medical opinion.  Graham asserts that the admission of these challenged portions of the medical testimony was prejudicial.

In response, Dr. Cook argues that the disputed testimony by Drs. Gross, Grady, and Man satisfies the requirements of Code § 8.01-399(B), because that testimony did not involve the rendering of diagnoses but merely addressed observations contemporaneously documented in the physicians' medical reports.  Dr. Cook also notes that Dr. Gross specifically was instructed at the beginning of his

9

testimony that he should state only those opinions he held within a reasonable decree of medical probability.

In considering these arguments, our analysis is guided by our decisions in King v. Cooley, 274 Va. 374, 650 S.E.2d 523 (2007); Holmes v. Levine, 273 Va. 150, 639 S.E.2d 235 (2007), and Pettus v. Gottfried, 269 Va. 69, 606 S.E.2d 819 (2005). In those cases, we addressed the admissibility under Code § 8.01-399(B) of certain testimony by treating physicians. Code § 8.01-399(B) states, in relevant part:

> If the physical or mental condition of the patient is at issue in a civil action, the diagnoses, signs and symptoms, observations, evaluations, histories, or treatment plan of the practitioner, obtained or formulated as contemporaneously documented during the course of the practitioner's treatment, together with the facts communicated to, or otherwise learned by, such practitioner in connection with such attendance, examination or treatment shall be disclosed but only in discovery pursuant to the Rules of Court or through testimony at the trial of the action. . . . Only diagnosis offered to a reasonable degree of medical probability shall be admissible at trial.

In Cooley, we considered the testimony of a treating physician, Dr. Robert Harry, who provided medical care to the plaintiff following surgery to repair a leak in her intestine. 274 Va. at 376, 650 S.E.2d at 525. Dr. Harry stated that he reached the following conclusion during his treatment of the plaintiff: "I felt she was suffering from aspiration pneumonia." Id. at 377, 650 S.E.2d at 525. The plaintiff conceded that this conclusion, which was

10

contemporaneously documented in Dr. Harry's medical report, was stated within a reasonable degree of medical probability. Id. at 377, 650 S.E.2d at 525. However, the circuit court excluded the testimony, ruling that Dr. Harry, who had not been designated as an expert witness, had impermissibly rendered an expert opinion. Id. at 377, 650 S.E.2d at 525. Although the defendant's challenge to this ruling on appeal did not present the question whether Dr. Harry's testimony constituted a medical diagnosis, we characterized the challenged testimony as "an actual diagnosis" and not "merely a factual impression." Id. at 379, 650 S.E.2d at 526.

In Holmes, we considered the medical testimony of a treating physician to determine whether that testimony involved the rendering of a diagnosis. The treating urologist had stated in her report that she "did not think that an occasional red blood cell would qualify for microscopic hematuria." 273 Va. at 157, 639 S.E.2d at 238. We held that this statement was not a medical diagnosis but was merely the urologist's "impression," formed during the plaintiff's treatment, that the presence of red blood cells was not clinically significant. Id. at 162, 639 S.E.2d at 241.

Similarly, in Pettus, we held admissible under Code § 8.01-399 a treating cardiologist's testimony that a patient's change in mental status "could have been" a central nervous system problem. 269 Va. at 77-78, 606 S.E.2d at 824-25. Although the cardiologist's statement was not rendered within a reasonable degree of medical

11

probability, we held that the testimony was admissible because it did not constitute a diagnosis.  Id. at 78, 606 S.E.2d at 825.  We characterized the testimony as  "factual in nature," and determined that the testimony merely explained the physician's impressions and conclusions formed while treating the patient.  Id. at 77-78, 606 S.E.2d at 824-25.

In applying the requirements of Code § 8.01-399(B) to the above testimony in Cooley, Holmes, and Pettus, we have illustrated the distinction between medical testimony that conveys impressions that are "factual in nature" and testimony that imparts a medical "diagnosis," which under Code § 8.01-399(B) must be stated within a reasonable degree of medical probability.  The present case presents another opportunity to draw this distinction.

In this context, we consider the challenged testimony of Graham's two radiologists, Dr. Grady and Dr. Man.  At issue in Dr. Grady's report and in his deposition testimony admitted at trial were statements that there was a "possibility of avascular necrosis," and that "avascular necrosis cannot be excluded."  Similarly, Dr. Man testified over Graham's objection that his examination had raised a "suspicion for avascular necrosis," and that Graham's bony defect suggested "fracture and avascular necrosis."  In testimony that was not challenged, Dr. Man further explained that avascular necrosis cannot be diagnosed based solely on the results of a CT scan, and that other conditions could manifest the findings he described.

12

We conclude that the challenged statements made by Dr. Grady and Dr. Man were factual in nature and related the physicians' impressions and conclusions formed when treating Graham. As factual impressions formed during these doctors' treatment of Graham, the challenged findings are analogous to the statement from the treating cardiologist in Pettus that the patient's change in mental status "could have been" a central nervous system problem, 269 Va. at 77-78, 606 S.E.2d at 824-25, and the statement from the treating urologist in Holmes that she "did not think that an occasional red blood cell would qualify for microscopic hematuria." 273 Va. at 157, 639 S.E.2d at 238.

The statements by Dr. Grady and Dr. Man did not constitute diagnoses, because the statements did not purport to identify specifically the cause of Graham's health condition based on his signs and symptoms. See Cooley, 274 Va. at 379, 650 S.E.2d at 526; Combs v. Norfolk & Western Ry. Co., 256 Va. 490, 496-97, 507 S.E.2d 355, 358-59 (1998). Therefore, because the statements of Dr. Grady and Dr. Man did not impart a diagnosis, the statements were admissible under Code § 8.01-399(B), regardless whether they were stated within a reasonable degree of medical probability. Accordingly, we conclude that the circuit court did not err in admitting the challenged testimony from Dr. Grady and Dr. Man.

Dr. Gross' testimony, also challenged by Graham, included a two-part statement that he "did not see any gouging of the femoral head

13

from any hardware," and that Graham "clearly had Stage III avascular necrosis as his major problem." In considering the admission of these two separate parts of Dr. Gross' testimony, we again draw a clear distinction between a physician's factual impressions and the rendering of a diagnosis.

Dr. Gross' statement that he "did not see any gouging of the femoral head from any hardware" was admissible as a factual impression formed from observations he made during Graham's surgery and recorded in his postoperative report. Thus, like the physicians' statements from Holmes and Pettus quoted above, Dr. Gross' impressions regarding Graham's femoral head were factual and in the nature of an evaluation, rather than the rendering of a diagnosis specifically identifying the cause of Graham's health condition based on his signs and symptoms. See Code § 8.01-399(B); Cooley, 274 Va. at 379, 650 S.E.2d at 526; Combs, 256 Va. at 496-97, 507 S.E.2d at 358-59. Accordingly, the circuit court properly admitted this evidence under Code § 8.01-399(B), regardless whether it was stated within a reasonable degree of medical probability.

In contrast, Dr. Gross' testimony that Graham "clearly had Stage III avascular necrosis as his major problem," was the rendering of a diagnosis because that statement purported to identify specifically the cause of Graham's health condition. See Cooley, 274 Va. at 379, 650 S.E.2d at 526; Combs, 256 Va. at 496-97, 507 S.E.2d at 358-59. Thus, we are presented with the threshold question whether this

14

testimony satisfied the requirement of Code § 8.01-399(B) that only a diagnosis offered within a reasonable degree of medical probability is admissible at trial.

Before Dr. Gross gave this and other answers concerning Graham's condition, Dr. Cook's counsel stated, "Now, Doctor, some of my questions may or may not require medical opinion, and if your answer does include medical opinion, I would ask you only give such opinion if you hold it within a reasonable degree of medical probability." Dr. Gross responded, "Fifty-one percent."

Although Graham now asserts that this prefatory exchange between Dr. Cook's counsel and Dr. Gross provided an insufficient foundation for the admission of Dr. Gross' diagnosis of avascular necrosis, Graham failed to raise this objection when the questions were posed to Dr. Gross and when Dr. Gross responded. Instead, Graham objected to Dr. Gross' testimony regarding avascular necrosis on the basis that "[i]t's an opinion, and it's not contemporaneously recorded in his notes."

Because Graham failed to challenge at the deposition the form of the questions posed by Dr. Cook's counsel or whether Dr. Gross' diagnosis was stated within a reasonable degree of medical probability, we will not consider those issues here. Rule 4:7(d)(3)(B), which addresses the taking of deposition testimony, provides in relevant part:

15

Errors and irregularities occurring at the oral examination . . . in the form of the questions or answers . . . and errors of any kind which might be obviated, removed, or cured if promptly presented, are waived unless seasonable objection thereto is made at the taking of the deposition.

We apply the plain language of this rule. Thornton v. Glazer, 271 Va. 566, 570, 628 S.E.2d 327, 328 (2006); Lifestar Response of Md., Inc. v. Vegosen, 267 Va. 720, 724, 594 S.E.2d 589, 591 (2004); Mechtensimer v. Wilson, 246 Va. 121, 122, 431 S.E.2d 301, 302 (1993).

This provision requires that during a deposition, when an error in the form of a question by counsel or of an answer given by a witness can be cured by a timely objection, the objection must be stated timely or will be deemed waived. The issues that Graham raises here, regarding the form of the questions to Dr. Gross and whether his diagnosis was stated within a reasonable degree of medical probability, could have been cured by timely objections at the time the deposition testimony was taken. Thus, we do not consider the merits of Graham's argument regarding the adequacy of the prefatory exchange or of Dr. Gross' testimony about avascular necrosis. See Rule 4:7(d)(3)(B).

We next consider Graham's contention that the circuit court erred in permitting Dr. Man to testify about his habit of checking for hardware when reviewing a CT scan of a patient's joint. At trial, Graham objected to this testimony under Code § 8.01-399(B), on the ground that the testimony stated an opinion not contemporaneously documented in Dr. Man's report. On appeal, however, Graham advances

16

an additional argument addressing Dr. Cook's contention at trial that evidence of Dr. Man's habit or routine was admissible under Code § 8.01-397.1.[2] Graham now contends that Code § 8.01-397.1, which provides for the admission of evidence of a person's habit or routine, does not obviate the more specific provision of Code § 8.01-399(B) requiring contemporaneous documentation of a treating physician's testimony.

In response, Dr. Cook asserts that Graham's challenge to the admission of this testimony is barred procedurally because Graham did not adequately preserve his objection to the circuit court's proposed method for questioning Dr. Man on this subject.  We agree with Dr. Cook's contention.

The main purpose of requiring timely and specific objections to testimony is to allow the circuit court an opportunity to address the issues presented, thereby avoiding unnecessary appeals and reversals of the circuit court's judgment.  Nusbaum v. Berlin, 273 Va. 385,

---

[2] Code § 8.01-397.1 states,

A. Admissibility. Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eye witnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice. Evidence of prior conduct may be relevant to rebut evidence of habit or routine practice.

B. Habit and routine practice defined. A "habit" is a person's regular response to repeated specific situations. A "routine practice" is a regular course of conduct of a group of persons or an organization in response to repeated specific situations.

402-03, 641 S.E.2d 494, 503 (2007); Riverside Hospital, Inc. v. Johnson, 272 Va. 518, 526, 636 S.E.2d 416, 420 (2006); Johnson v. Raviotta, 264 Va. 27, 33, 563 S.E.2d 727, 731 (2002). A specific, contemporaneous objection also affords the opposing party an opportunity to address an issue at a time when the course of the trial may be altered to avoid the problem presented. Shelton v. Commonwealth, 274 Va. 121, 126, 645 S.E.2d 914, 916 (2007); Nusbaum, 273 Va. at 406, 641 S.E.2d at 505; Wright v. Norfolk & W. Ry. Co., 245 Va. 160, 168, 427 S.E.2d 724, 728 (1993).

In addition, when a timely objection is made, a party may not later abandon that objection during trial and attempt to reassert the same objection on appeal. A party will be held to have waived a timely objection if the record affirmatively shows that he has abandoned the objection or has shown by his conduct the intent to abandon that objection. Helms v. Manspile, 277 Va. 1, 6, 671 S.E.2d 127, 129 (2009); Shelton, 274 Va. at 127-28, 645 S.E.2d at 917; King v. Commonwealth, 264 Va. 576, 581, 570 S.E.2d 863, 865-66 (2002); Chawla v. BurgerBusters, Inc., 255 Va. 616, 623, 499 S.E.2d 829, 833 (1998).

Here, Graham did not object at trial to Dr. Man's testimony on the basis that Code § 8.01-397.1 does not permit the admission of such testimony. Therefore, this part of his argument is barred on appeal by Rule 5:25. Nusbaum, 273 Va. at 406, 641 S.E.2d at 505.

18

We further conclude that while Graham initially objected at trial on the basis that Dr. Man's testimony about his habit or routine was an opinion not contemporaneously documented in his report, Graham later affirmatively abandoned that objection. After the circuit court suggested that the parties should "be[] honest" with the jury and let the jury decide the import of Dr. Man's testimony regarding his habit or routine, Graham responded, "I don't have a problem with that." By this affirmative statement, Graham informed the circuit court and Dr. Cook that Graham no longer opposed the admission of the testimony at issue. Therefore, we do not reach the merits of Graham's initial argument regarding the admission of this testimony during Dr. Cook's direct examination of Dr. Man. See Helms, 277 Va. at 6, 671 S.E.2d at 129; Shelton, 274 Va. at 127-28, 645 S.E.2d at 917; King, 264 Va. at 581, 570 S.E.2d at 865-66; Chawla, 255 Va. at 623, 499 S.E.2d at 833.

Graham also argues, however, that the circuit court erred in limiting his cross-examination of Dr. Man. Graham contends that this error occurred when the circuit court prevented him from asking Dr. Man whether the CT film he interpreted showed an intraarticular screw, and inquiring regarding the notation Dr. Man would have made had he observed a screw in the hip joint. Graham contends that he should have been permitted to pursue this line of questioning during cross-examination because Dr. Cook was permitted to elicit from Dr.

19

Man on direct examination a "present-day" opinion regarding his reading of the CT scan.

We are unable to consider the merits of this argument because the issue has not been preserved properly for appeal. When trial testimony is excluded before it is delivered, an appellate court lacks a basis for reviewing a circuit court's evidentiary ruling unless the record reflects a proper proffer. Cooley, 274 Va. at 380-81, 650 S.E.2d at 527; Chappell v. Virginia Elec. & Power Co., 250 Va. 169, 173, 458 S.E.2d 282, 284-85 (1995); Whittaker v. Commonwealth, 217 Va. 966, 968, 234 S.E.2d 79, 81 (1977). Although Graham's counsel stated that he intended to cross-examine Dr. Man regarding his interpretation of the CT scan, and intended to ask Dr. Man to state the notations he would have made had he observed the presence of an intraarticular screw, Graham's counsel did not proffer the testimony he expected to elicit from Dr. Man. Because Graham failed to make such a proffer, we are unable to determine whether the circuit court's decision to exclude this testimony, if erroneous, resulted in prejudice to Graham. See Cooley, 274 Va. at 380, 650 S.E.2d at 527; Williams v. Harrison, 255 Va. 272, 277, 497 S.E.2d 467, 471 (1998); Chappell, 250 Va. at 173, 458 S.E.2d at 284-85.

Finally, Graham argues that the circuit court erred when it prevented him from discussing in his closing argument the x-rays that were admitted into evidence. Graham contends that he had a right to

20

discuss the x-rays and to invite the jury to engage in a comparison of this evidence.  We disagree with Graham's argument.

In considering whether the trial court erred in excluding portions of Graham's closing argument, we note that determinations regarding the propriety of argument by trial counsel are matters left to the sound discretion of the circuit court.  Jordan v. Taylor, 209 Va. 43, 51-52, 161 S.E.2d 790, 795-96 (1968); Cohen v. Power, 183 Va. 258, 262, 32 S.E.2d 64, 65 (1944); see Bassett Furniture Indus., Inc. v. McReynolds, 216 Va. 897, 909, 224 S.E.2d 323, 330 (1976).  We will not interfere with a circuit court's ruling regarding counsel's closing argument unless it appears that the circuit court has abused its discretion, and that the rights of the complaining litigant have been prejudiced.  Jordan, 209 Va. at 51-52, 161 S.E.2d at 795-96.

Although counsel for a party generally has wide latitude in making closing arguments, counsel may not argue as evidence in the case matters that do not appear in the record.  See Velocity Express Mid-Atlantic, Inc. v. Hugen, 266 Va. 188, 198-99, 585 S.E.2d 557, 563 (2003); Atlantic Coast Realty Co. v. Robertson, 135 Va. 247, 263, 116 S.E. 476, 481 (1923).  Counsel has no right to testify in the guise of making argument, nor to assume the existence of evidence that has not been presented.  Velocity Express, 266 Va. at 199, 585 S.E.2d at 563; Atlantic Coast, 135 Va. at 263, 116 S.E. at 481.  Rather, the purpose of closing argument is to draw the jury's attention to the

21

body of evidence that has been admitted into the record and to argue reasonable inferences that may be drawn from that evidence.

Here, the parties did not present evidence addressing a comparison of the x-rays. Comparisons of this nature would have required an evidentiary foundation regarding the magnification and the angle of the different x-rays. Moreover, such comparisons were not a matter within the common knowledge and experience of the jury. In urging the jury to compare the x-rays, Graham asked the jury to conclude that the defect in the femoral head stopped expanding after the screw was removed. Such a conclusion, however, could not be drawn from the x-rays in the absence of expert testimony addressing this issue. See Perdieu v. Blackstone Family Practice Ctr., Inc., 264 Va. 408, 420-22, 568 S.E.2d 703, 710-11 (2002); Holmes v. Doe, 257 Va. 573, 578, 515 S.E.2d 117, 120 (1999). Under these circumstances, in the absence of expert testimony concerning the comparative features of the x-rays, the circuit court did not abuse its discretion in limiting this aspect of Graham's closing argument. See Jordan, 209 Va. at 51-52, 161 S.E.2d at 795-96.

For these reasons, we will affirm the circuit court's judgment.

Affirmed.

22