COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present: Judges Athey, Ortiz and Lorish
Argued at Norfolk, Virginia


EMERGENCY PHYSICIANS OF TIDEWATER, PLC
  AND ALLISON L. RAINES, D.O.
                                                    MEMORANDUM OPINION* BY
v.      Record No. 0121-22-1                   JUDGE CLIFFORD L. ATHEY, JR.
                                                        FEBRUARY 7, 2023
PATRICIA HANGER


        FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
                         Stephen C. Mahan, Judge

            A. William Charters (C. Thea Pitzen; Jeffrey S. Kiser; Goodman
            Allen Donnelly, PLLC, on briefs), for appellants.

            L. Steven Emmert (Richard N. Shapiro; Eric K. Washburn; Sykes,
            Bourdon, Ahern & Levy, PC; Shapiro, Washburn & Sharp PC, on
            brief), for appellee.


        Following an eight-day jury trial in the Circuit Court of the City of Virginia Beach ("trial

court"), Patricia Hanger ("Hanger") was awarded a joint and several judgment of $1.6 million

against Dr. Allison Raines ("Dr. Raines") and Emergency Physicians of Tidewater, PLC

("Tidewater, PLC") as a result of a traumatic brain injury she suffered from a fall proximately

caused by the negligence of Dr. Raines and Tidewater, PLC (collectively "Emergency

Physicians"). Emergency Physicians contend, in ten separate assignments of error, that the trial

court erred by: (1) failing to sustain their motion to strike on the ground of failure to establish

causation, (2) failing to sustain their motion to strike on the ground of failure to establish

damages, (3) denying their motion for a continuance when their trial counsel was not provided a

_____
        * Pursuant to Code § 17.1-413, this opinion is not designated for publication.

jury venire list in accordance with Code § 8.01-353, (4) denying the admission of certain medical records, (5) denying the admission of the audit trail, (6) allowing remarks to the jury during closing arguments regarding the alleged failure of a representative of Tidewater, PLC to be present at trial, (7) failing to give Emergency Physicians' requested Jury Instruction D, (8) allowing Hanger to appear as an unsworn witness and also permitting her counsel to comment on Hanger's medical condition and the reasons why she did not testify at trial during closing statements, (9) excluding from evidence certain statements allegedly made by Hanger's husband and preventing the use of the alleged statements for impeachment purposes, and (10) permitting Hanger's counsel to argue to the jury during closing statements about the "snowball" effect of the evidence while utilizing a demonstrative exhibit to do so. For the reasons that follow, we find no error and therefore affirm the judgment of the trial court.

## I. BACKGROUND

"When reviewing a trial court's decision on appeal, we view the evidence in the light most favorable to the prevailing party, granting it the benefit of any reasonable inferences." *Congdon v. Congdon*, 40 Va. App. 255, 258 (2003).

On March 15, 2017, Hanger went to the office of her primary care physician Dr. Wong, where she was treated by a physician's assistant. She complained of upper abdominal pain, as well as anxiety that had started after she received a hysterectomy in January of 2017. She was prescribed Prilosec and lorazepam before going home.

The following day, on March 16, 2017, Hanger sought treatment in the emergency department at Sentara Leigh Hospital in Norfolk. She complained of upper abdominal pain and nausea without vomiting. Dr. Raines, then an employee of Tidewater, PLC, was the treating physician during this visit and prescribed morphine for Hanger's pain, zofran for her nausea, and intravenous saline. A comprehensive panel of blood tests was also performed which indicated that

- 2 -

the serum sodium level in Hanger's blood was abnormally low, a condition called hyponatremia. The test of her serum sodium level reflected a sodium level of 122 which was lower than the normal range of 133-145. As a result, Dr. Raines ordered that Hanger be administered additional intravenous normal saline. At trial, Dr. Raines testified that she noticed the low serum sodium test result, "discussed her results with the patient and [patient's] husband," Kurt Hanger ("Kurt"), and "established an outpatient care plan" with them. A CT scan of Hanger's abdomen was also performed, and the emergency room visit, in its entirety, lasted from around 4:43 p.m. on March 16, to 12:30 a.m. on March 17. Dr. Raines failed to list a diagnosis of hyponatremia in the medical records related to the emergency care and released Hanger from emergency care with instructions to follow up with her primary care doctor and her gastroenterologist as soon as possible. After being administered pain and nausea medicine, upon discharge from emergency care, Hanger reported zero pain and her condition was deemed stable.

On March 22, 2017, Hanger returned to her primary care physician's office, following up on her abdominal pain after the emergency department visit. She also complained of depression and anxiety and was again treated by a physician's assistant and prescribed lorazepam along with an antidepressant. At trial, Dr. Wong, Hanger's primary care physician, testified that he had access to the records from her March 16 emergency department visit but did not recall reviewing those records prior to co-signing, along with his physician's assistant, a March 22 physician's note summarizing the office visit. He testified that he was not aware whether his physician's assistant had reviewed the emergency department records.

On March 28, 2017, twelve days after the initial emergency room encounter with Dr. Raines, Kurt returned home from work at about 2:45 p.m. and discovered Hanger on their kitchen floor, partially leaning against the wall and bleeding from a wound over her right eye. She was also non-responsive, resulting in her husband contacting 911 for emergency assistance.

Eventually, emergency medical technicians responded and subsequently transported Hanger by rescue squad back to the emergency department at Sentara Leigh Hospital. While there, a CT scan of Hanger's head was performed which indicated that she had suffered a traumatic brain injury ("TBI") from the fall in their kitchen. She was then transferred by ambulance to a certified trauma center located at Sentara Norfolk General Hospital ("Norfolk General"). When admitted to Norfolk General, Hanger's serum sodium had further dropped to 115, well below the normal range. The neurosurgery team at Norfolk General was consulted and determined that surgical intervention was not required. Hanger was admitted for inpatient treatment at Norfolk General and remained hospitalized until April 7, 2017. Upon discharge from Norfolk General, she was transported to Harbor's Edge, a rehabilitation facility, for short term rehab following her hospital stay. She was treated at Harbor's Edge until her release on April 15, 2017, when she returned to her home and began receiving outpatient therapy.

On July 5, 2018, Hanger filed a medical malpractice suit against Tidewater, PLC and Dr. Raines. The complaint alleged that they violated the appropriate standard of care in their treatment of Hanger's hyponatremia and thereby proximately caused the fall resulting in her traumatic brain injury.

The circuit court clerk did not timely provide the prospective juror list to Emergency Physicians' counsel despite their requesting the jury venire list pursuant to Code § 8.01-353(A). However, on the day before trial, both Emergency Physicians and Hanger were provided a prospective juror list of 200 individuals followed that afternoon by a refined list of 85 potential jurors along with their answers to the standard juror questionnaire. After receiving the jury venire lists, Emergency Physicians filed a motion for a continuance of the trial which the trial court denied the morning of the trial. Both Emergency Physicians and Hanger were afforded an opportunity on

voir dire to question the jury venire and strike jurors for both cause and peremptorily before the trial court empaneled the jury.

At trial, during her case in chief, Hanger called Dr. Kenneth Larsen ("Dr. Larsen") who was deemed qualified by the trial court as an expert in emergency medicine, including but not limited to emergency medical patient care, and emergency medicine patient records. Dr. Larsen opined that Emergency Physicians breached the standard of care of an emergency room physician treating hyponatremia by failing to address the low serum sodium levels through hospitalization and supplemental sodium infusion. He also testified concerning the recognizable symptoms of hyponatremia including but not limited to muscle weakness, altered mental status, coma, seizure, and brain herniation.

Hanger also called Dr. Robert Hansen ("Dr. Hansen") whom the trial court deemed qualified as an expert in neurological medicine and disorders, neurological manifestations of metabolic disturbances, and neurological causation. He opined that Hanger's hyponatremia caused a seizure, which in turn caused her to fall in her kitchen on March 28, 2017, strike her head, and suffer a TBI. Dr. Hansen also opined on the effect of a TBI generally and specifically opined that, based upon his review of Hanger's medical records, the seizure, fall, and TBI had proximately caused Hanger to suffer from a permanent impairment affecting her memory and cognitive abilities.

Dr. Richard Serra ("Dr. Serra") was also deemed qualified by the trial court as an expert in emergency medicine practice including ER patient care and patient records, as well as the medical causation of injuries like those suffered by Hanger as a result of her fall on March 28, 2017. Initially, Dr. Serra testified generally concerning hyponatremia's symptoms which can include fatigue, lethargy, nausea, vomiting, headache, cramping, altered mental status, seizures, coma, brain herniation, and death. Dr. Serra then opined specifically that Emergency Physicians breached the appropriate standard of care of an emergency room physician treating Hanger for hyponatremia and

that Hanger's untreated hyponatremia then proximately caused her to suffer a seizure which caused her to fall and strike her head, resulting in a TBI. The expert testimony provided by Doctors Larsen, Hansen, and Serra concerning the symptoms of hyponatremia, including, nausea, vomiting, headache, dizziness, confusion, fatigue, unsteady gate, cramps, muscle weakness, altered mental status, coma, seizure, brain herniation, and death, were later confirmed by the medical experts who testified at the behest of Emergency Physicians.

Hanger's husband, Kurt, also testified that his wife was unable to perform many tasks that she had performed before the TBI, including taking care of their grandchildren, managing their rental properties, and driving. Julia Duzant-Boyette ("Duzant-Boyette"), an employee of the City of Virginia Beach Parks and Recreation Department who administers a program for senior citizens including Hanger, testified that prior to the TBI, Hanger was social, energetic, and pleasant but post-injury had become argumentative, impatient, and withdrawn.

During trial, the trial court denied Emergency Physicians' attempts to use written statements attributed to Kurt found in Hanger's medical records. The March 28, 2017 emergency department record indicated that Kurt told medical personnel that his wife might have fallen due to slipping on water or tripping over a dog. Kurt denied ever making such a statement, and during his direct examination, he testified that he did not recall making any statements to emergency medical staff speculating on how the fall may have occurred. Based on his direct testimony, the trial court excluded the alleged statements from evidence and did not permit Emergency Physicians to impeach Kurt with the medical record, holding that there was insufficient foundation for the introduction of the medical record, that the evidence was speculative, and the issue itself was collateral.

During trial, Emergency Physicians also sought to admit into evidence other previously authenticated medical records, including an audit trail document created by the medical providers to

track Hanger's treatment and which providers viewed the medical records. Although the trial court did not admit all of the medical records that Emergency Physicians sought to introduce, the trial court did admit portions of Hanger's medical records it deemed relevant and for which a proper foundation was established. Specifically, the trial court denied admission of: (1) the entire Sentara Family Medicine (primary care) record of Hanger, or, in the alternative, certain excerpts from those records, (2) certain excerpts of Hanger's medical records related to the treatment she received at Norfolk General as well as certain records from Sentara Neurology Specialists, and (3) an unredacted emergency department note related to her treatment there on March 28, 2017. The trial court based its ruling denying admission of the documents on the grounds of foundation, hearsay, the cumulative nature of the records, and the relevance of the records to the facts in this case.

The trial court also found that despite the audit trail record's stipulated authenticity, Emergency Physicians failed to lay a proper foundation for admission of the nineteen-page audit trail charting each medical professional who reviewed portions of Hanger's medical record. In fact, each time Emergency Physicians attempted to enter the audit trail in evidence during the trial, the trial court sustained Hanger's objection as to the lack of a proper foundation for its admission into evidence. During consideration of each request for admission and the objection thereto, the trial court inquired extensively about the nature and use of the audit trail by the medical providers concerning the treatment of Hanger. The trial court was advised that the audit trail was a "report generated from a database" and that the audit trail contained hyperlinks, which when viewed in its original format, could have been clicked on to view other medical records. The trial court noted that on its face, the audit trail document sought to be admitted was "meaningless" and "not self-explanatory." Ultimately, the trial court denied its admission into evidence for lack of foundation; however, the court did permit the medical experts called by

Emergency Physicians to opine that based on their review of the records, the emergency room records were forwarded to Hanger's primary care physician.

After the close of Hanger's case in chief, Emergency Physicians moved to strike her evidence, arguing that Hanger had failed to prove both proximate causation and damages. Emergency Physicians argued that there was no evidence admitted connecting Hanger's hyponatremia with her TBI and also no evidence about a treatment plan that Dr. Raines should have ordered that would have prevented the injury on March 28 (assuming it was a result of the untreated hyponatremia). Emergency Physicians also contended that Hanger had failed to put on any evidence of her condition both before or after the TBI on March 28, 2017, and therefore failed to prove how and to what extent she was harmed. The trial court denied Emergency Physicians' motion to strike as to each ground asserted.

During Emergency Physicians' case in chief, Hanger, who was seated at her counsel's table in a wheelchair and wore dark glasses, attended the trial for the first time; however, she was not called as a witness by either party. Dr. Gregory Marchand, who was called by Emergency Physicians during their case in chief as an expert on the standard of care of an emergency physician, opined that Dr. Raines "more than complied with the standard of care and treatment of [Hanger]." Dr. Michael Seneff was also qualified as an expert witness in the field of "internal medicine critical care." He opined that Dr. Raines' treatment plan for Hanger was appropriate and that there was not "any evidence that [Hanger] suffered a seizure."

At the conclusion of all the evidence, Emergency Physicians renewed their motion to strike Hanger's evidence on the same grounds. The trial court permitted the contested issues in the case to be resolved by the jury by denying the renewed motion.[1]

---

[1] The trial court did grant one part of Emergency Physicians' motion to strike at this point. The trial court struck the testimony of one of Hanger's witnesses, but this is not at issue on appeal.

The trial court next considered various "agreed to" and contested jury instructions offered by Hanger and Emergency Physicians. The trial court denied the following jury instruction, which Emergency Physicians assigns as error:

> If you believe from the evidence that the injury to Patricia Hanger might have resulted from either of two causes, for one of which Dr. Raines might have been responsible and for the other of which the Dr. Raines was not responsible, and if you are unable to determine which of the two causes occasioned the injury complained of, then the plaintiff cannot recover.

The trial court then instructed the jury on the law governing its deliberations and how to complete the verdict form. During the closing argument which followed, counsel for Hanger attempted to use a demonstrative exhibit (audiovisual slide) to argue that his client did not testify during the trial due to her memory loss from the TBI. Emergency Physicians objected to the use of the demonstrative exhibit and any reference to Hanger failing to testify because of the TBI. The trial court sustained the objection to the use of the demonstrative exhibit and instructed the jury to disregard it. However, the trial court did permit counsel for Hanger to argue on closing that his client had suffered memory loss as a result of her injuries based upon the prior expert testimony in evidence.

In addition, counsel for Hanger also argued, based upon his interpretation of a model jury instruction given by the trial court concerning proximate cause, that:

> [I]f [Dr. Raines] started the ball rolling due to a negligent failure to follow the standard of care and if you believe that was a direct cause of the seizure event, if something else bothers you about what happened between the 16th and the 28th—like events with her family doctor, for example—this instruction says it doesn't matter, if you believe that she was negligent and that her negligence caused the event.
>
> So other things can contribute, but if she started them rolling directly toward the damage, then she's responsible—that's what it says—and this is what happened here. It's like a snowball effect. She missed the diagnosis.

Counsel for Hanger also displayed a demonstrative exhibit to the jury which depicted this so called "snowball" effect. When Emergency Physicians' counsel objected that this argument was inconsistent with the jury instruction and a prior ruling of the trial court, the trial court barred the use of the demonstrative exhibit and further instructed the jury that what the attorneys state during closing is argument, not evidence, and that they should evaluate the closing arguments in light of the evidence and the jury instructions.

Counsel for Hanger also argued during closing statements that Tidewater, PLC had not sent a corporate representative to the trial. Counsel for Emergency Physicians objected, claiming for the first time that Dr. Raines was at trial in both her personal capacity and as a corporate representative of Tidewater, PLC. The trial court noted that counsel for Emergency Physicians was free to address the issue in his closing argument. Hanger's counsel resumed his argument after that exchange by noting that Dr. Raines was no longer employed by Tidewater, PLC. In rebuttal, counsel for Hanger also commented on Tidewater, PLC's failure to send a witness to testify at trial.

The jury deliberated and returned a verdict of $1.6 million on October 1, 2021. On October 15, 2021, Emergency Physicians filed a motion to set aside the verdict, a motion for judgment notwithstanding the verdict, and a motion for a new trial. Hanger filed opposition memorandums, and the trial court held post-verdict motions hearings on October 29, 2021, and December 2, 2021. The trial court denied Emergency Physicians' post-verdict motions. Emergency Physicians also asked the trial court to dismiss the case or otherwise sanction Hanger for spoliation of evidence. The trial court found there was no spoliation of evidence and denied the motion. The trial court subsequently entered a final order of judgment in favor of Hanger in the amount of $1.6 million on December 28, 2021. Emergency Physicians timely noted their appeal from the final order.

## II. ANALYSIS

A. *The trial court did not err in refusing Emergency Physicians' motion to strike for failure to prove causation.*

Emergency Physicians contend that the trial court erred in denying their motion to strike Hanger's evidence because the evidence failed to establish causation. We disagree.

We review "a circuit court's decision on a motion to strike in the light most favorable to the non-moving party, and the non-moving party 'must be given the benefit of all substantial conflict in the evidence, and all fair inferences that may be drawn therefrom.'" *Dill v. Kroger Ltd. P'ship I*, 300 Va. 99, 109 (2021) (quoting *Egan v. Butler*, 290 Va. 62, 73 (2015)). "A circuit court must rule on a motion to strike based on the presumption that the jury will believe all the evidence favorable to the plaintiff, as well as all reasonable inferences that a jury might draw therefrom in favor of the plaintiff." *Id.* A plaintiff is required to "prove his case by a fair preponderance of the evidence." *United Dentists, Inc. v. Bryan*, 158 Va. 880, 887 (1932). "[A] plaintiff, in his proof, is not required to exclude every possibility that the injury might have been caused through some means for which the defendant is not responsible." *Id.*

1. Hanger introduced sufficient evidence that her undiagnosed hyponatremic condition caused her traumatic brain injury.

Emergency Physicians contend that the trial court erred in denying their motion to strike because Hanger failed to establish what caused the fall that caused her TBI. We disagree.

Hanger presented expert testimony that the symptoms of hyponatremia included muscle weakness, fatigue, lethargy, dizziness, confusion, nausea, vomiting, headache, cramping, unsteady gait, altered mental status, coma, and seizure. Dr. Hansen testified: "I think the event that occurred that produced the closed-head injury and the significant damage to her brain was a result of alteration of consciousness—a seizure, in my opinion—resulting from her low sodium level." Dr. Hansen also opined that Hanger suffered "a hyponatremic seizure and had a head

- 11 -

injury as a result of the alteration of consciousness." Dr. Serra opined that hyponatremia caused Hanger to suffer a seizure and that she received a TBI as a result of the fall caused by that seizure.

Here, the jury could have concluded from the evidence that Hanger was suffering from hyponatremia, the symptoms of which all the experts agreed included muscle weakness, dizziness, altered mental status, and seizure. The jury could also have concluded, based upon all the evidence, that, as a result, the untreated hyponatremia proximately caused a seizure resulting in the fall causing Hanger's TBI. Even though the expert opinions offered by Emergency Physicians and Hanger conflicted on whether a hyponatremic seizure caused the fall, the jury could have concluded, as it did, based on three experts called by Hanger during her case in chief, that the seizure caused the fall and resulting TBI. Moreover, the conflicting expert testimony on causation alone cannot support a finding that the trial court erred in denying the motion to strike since the evidence on causation presented by both Emergency Physicians and Hanger was sufficient to submit to the jury for resolution.

2. Hanger presented sufficient evidence that proper treatment would have prevented the harm suffered.

Emergency Physicians also contend that Hanger failed to introduce sufficient evidence of either the medical treatment Hanger should have received or whether that treatment would have prevented Hanger from suffering a TBI. We disagree.

Emergency Physicians allege this particular error while relying on *Dixon v. Sublett*, 295 Va. 60, 63 (2018), a case where a patient underwent surgery by a defendant surgeon, then two days later underwent a second surgery by a different surgeon during which a bowel injury was discovered and repaired. In that case, there was expert testimony presented that the applicable standard of care required the defendant surgeon to identify the bowel injury during the first surgery and then refer the plaintiff patient to a general surgeon for expedited surgery to repair the

- 12 -

bowel injury. However, because no expert evidence about whether expedited surgery by a general surgeon would have led to any lesser harm, the Supreme Court held that the plaintiff had not met her burden of proving causation. *Id.* at 67, 69.

Here, the blood test performed on Hanger prescribed by Emergency Physicians indicated that Hanger was suffering from hyponatremia. As a result of the failure of Dr. Raines to transcribe the hyponatremia diagnosis in the emergency department notes, the jury could have reasonably concluded that Dr. Raines failed to diagnose the hyponatremia revealed by the blood test and, as a result, the hyponatremia remained untreated for twelve days. In the alternative, the jury could also have reasonably concluded based on the expert testimony of Dr. Serra that even if Dr. Raines diagnosed the hyponatremia on March 16, she failed to properly treat the hyponatremia by admitting Hanger to the hospital to raise her sodium levels. Therefore, whether or not the hyponatremia was properly diagnosed on March 16, the expert opinion of Dr. Serra that Hanger should have been admitted to the hospital and treated to raise her sodium level on March 16 instead of being discharged from the emergency department with only instructions to follow up with her primary care physician, presented sufficient evidence for the jury to find that the treatment plan proposed by Dr. Serra, if followed, could have prevented the seizure and fall. In addition, evidence of Hanger's treatment and recovery after the TBI was sufficient to show that her hyponatremia could have been successfully corrected if treated.

Since we have thus determined that the jury could have reasonably concluded that the failure to diagnose and properly treat the hyponatremia, or the failure to properly treat the hyponatremia alone, was a proximate cause of Hanger's seizure, and by extension, fall and TBI, the jury could have reasonably inferred from the expert testimony that had her serum sodium levels been raised through proper diagnosis and treatment, she would not have suffered a seizure or the resulting fall and TBI. Therefore, unlike *Dixon,* we cannot conclude that Hanger failed to

- 13 -

present sufficient expert evidence of the effect of either Emergency Physicians' failure to properly diagnose the hyponatremia or to remedy the condition through proper treatment including hospitalization. Since the jury could have inferred from that evidence that earlier diagnosis and treatment would have prevented the seizure, fall, and TBI, Emergency Physicians' argument that the facts in *Dixon* are applicable here is misguided.

B. *The trial court did not err in refusing Emergency Physicians' motion to strike for not proving damages.*

Emergency Physicians next contend that the trial court erred in denying their motion to strike because Hanger failed to establish any damages resulting from the negligence alleged. We disagree.

"When reviewing a circuit court's decision on a motion to strike, we must 'review the evidence in the light most favorable to the non-moving party.'" *Egan*, 290 Va. at 73 (quoting *Kiddell v. Labowitz*, 284 Va. 611, 629 (2012)). "That is, the non-moving party must be given 'the benefit of all substantial conflict in the evidence, and all fair inferences that may be drawn therefrom.'" *Id.* (quoting *Hadeed v. Medic-24 Ltd.*, 237 Va. 277, 281 (1989)).

To prevail in a negligence action, of course, a plaintiff must prove that they suffered damages. *Blue Ridge Serv. Corp. of Va. v. Saxon Shoes, Inc.*, 271 Va. 206, 218 (2006). Emergency Physicians argue that in a medical malpractice action, evidence of damages can only be presented by way of expert testimony. In support of this proposition, Emergency Physicians cite *Raines v. Lutz*, 231 Va. 110 (1986), as authority. In *Raines*, the Supreme Court held, "expert testimony is ordinarily necessary to establish the appropriate standard of care, to establish a deviation from the standard, and to establish that such a deviation was the proximate cause of the claimed damages." *Id.* at 113 (citations omitted). Pointedly absent in the *Raines* decision is any requirement that in a medical malpractice case either the existence, nature, or extent of damages be proven by expert testimony.

However, here, Hanger would meet this nonexistent standard because Dr. Hansen, an expert witness, testified that he evaluated Hanger's mental status in August 2018, after the injury, and based thereon, opined that Hanger was "quite impaired." Dr. Hansen also testified that his subsequent evaluation only confirmed his initial opinion that Hanger's mental impairment affected her memory and her cognitive abilities in general. Specifically, Dr. Hansen opined that: "There was rather significant impairment of executive function meaning our ability to interact cognitively with the environment, . . . recognize and perform tasks, thinking, memory, execution. She had problems in all those areas." Dr. Hansen also testified that upon his review of her medical records, Hanger's mental impairment was a result of the seizure and fall she suffered on March 28, 2017. Finally, he opined that the mental impairment was permanent and that she would always require the assistance of family in managing her affairs.

Duzant-Boyette, a lay witness, also testified that she had known Hanger both before and after her TBI in her role managing seniors' programs for the City of Virginia Beach Parks and Recreation Department. She testified that before the injury, Hanger had been pleasant, social, and energetic but after the TBI, Hanger was argumentative, impatient, and withdrawn. Hanger's husband, Kurt, also testified that after the TBI his wife did not engage in her prior activities such as driving, taking care of their grandchildren, and managing the couple's rental properties. As a result of both the expert and lay testimony, the jury could have reasonably concluded, based on the evidence, that Hanger was injured and permanently impaired as a result of the failure of Emergency Physicians to diagnose or properly treat the hyponatremia. Hence, we cannot conclude that the trial court erred in denying the motion to strike and permitting the jury to resolve any conflicting evidence concerning damages.

C. *The trial court did not err in refusing Emergency Physicians' motion for continuance.*

Emergency Physicians next contend that the trial court abused its discretion when it denied their motion for a continuance as a result of not being provided a jury venire list until the day before trial. We disagree.

"The decision to grant a motion for a continuance is within the sound discretion of the [trial] court and must be considered in view of the circumstances unique to each case." *Haugen v. Shenandoah Valley Dep't of Soc. Servs.*, 274 Va. 27, 34 (2007). "The circuit court's ruling on a motion for a continuance will be rejected on appeal only upon a showing of abuse of discretion *and* resulting prejudice to the movant." *Id*.

Code § 8.01-353(A) states, "[u]pon request, the clerk . . . shall make available to all counsel of record in that case, a copy of the jury panel to be used for the trial of the case at least three full business days before the trial." It is also settled law "that the use of 'shall,' in a statute requiring action by a public official, is directory and not mandatory unless the statute manifests a contrary intent." *Jamborsky v. Baskins*, 247 Va. 506, 511 (1994). The Supreme Court applied this principle to Code § 8.01-353 in *Butler v. Commonwealth*, 264 Va. 614, 620 (2002), and found that its requirements are directory rather than mandatory. "When dealing with a statute whose terms are directory, '[a]ny determination whether a [party] has suffered prejudice constituting a denial of due process must be made on a case-by-case basis.'" *Id.* (alterations in original) (citing *Jamborsky*, 247 Va. at 511).

Here, Emergency Physicians argue that their inability to conduct any research regarding prospective jurors by itself constitutes prejudice. However, on brief, they fail to articulate any specific prejudice they suffered as a result of both parties receiving the jury venire list the day before trial instead of three business days before trial. They also fail to articulate why this mutual inability to research jurors could not have been adequately accomplished during *voir dire*

prior to petit jury selection. In *Butler*, where "[i]mmediately following opening statements at . . . trial, a juror suddenly became ill," and after recessing until the next day, the court declared a mistrial and empaneled a new jury, the Supreme Court found that Butler "ha[d] not demonstrated that he suffered any specific prejudice that constituted a denial of due process as a result of the circuit court's refusal to grant his motion for a continuance when the jury panel had to be reconstituted in this case." *Id.* Similarly, Emergency Physicians fail to articulate any prejudice suffered specific to them and instead makes only a vague assertion that more time to research the juror list may have impacted juror selection. Since this slight impediment was equally visited upon both parties, we cannot conclude based upon a contested motion for continuance by one of the parties that the trial court abused its discretion in denying Emergency Physicians' motion for a continuance.

D. *The trial court did not err in its refusal to admit certain medical records.*

Emergency Physicians next contend that the trial court abused its discretion in refusing to admit certain medical records. We disagree

1. Emergency Physicians assign error to only one of several grounds for exclusion articulated by the trial court.

Because Emergency Physicians assign error on only one of several articulated bases for the trial court's ruling, we decline to reach this assignment of error on the merits.

"It is well-settled that a party who challenges the ruling of a lower court must on appeal assign error to each articulated basis for that ruling." *Manchester Oaks Homeowners Ass'n, Inc. v. Batt*, 284 Va. 409, 421 (2012) (citing *United Leasing Corp. v. Thrift Ins. Corp.*, 247 Va. 299, 307-08 (1994); *Parker-Smith v. Sto Corp.*, 262 Va. 432, 441 (2001); *Rash v. Hilb, Rogal & Hamilton Co.*, 251 Va. 281, 286 (1996)). When an appellant fails to assign error to each basis for the trial court's ruling, an appellate court "still must satisfy [itself] that the alternative holding is indeed one that (when properly applied to the facts of a given case) would legally constitute a

- 17 -

freestanding basis in support of the trial court's decision." *Johnson v. Commonwealth*, 45 Va. App. 113, 117 (2005). "Where . . . appellant's assignments of error leave multiple bases for the challenged ruling uncontested, . . . review is satisfied by a determination that any one of them provides a sufficient legal foundation for the ruling." *Manchester Oaks Homeowners Ass'n, Inc.*, 284 Va. at 422.

Here, Emergency Physicians' assignment of error only alleges that "[t]he [t]rial [c]ourt erred in denying the admission of certain medical records as evidence when such records were authentic and should have been admissible under the modern [s]hopbook [r]ule and Virginia Rule of Evidence 2:803." However, as even Emergency Physicians acknowledge in their brief, the trial court denied admission not only on grounds of hearsay but also because of the cumulative nature of the evidence, the relevance of the evidence, and the failure to lay a proper foundation. The trial court also, in ruling on the admissibility of at least a subset of the documents, found that "their probative value is outweighed very substantially by . . . the possibility for confusion and prejudice," and further noted that a subset of the records "invite the jury to speculate about technical medical circumstances about which there's been no evidence or testimony that would provide any basis for the jury to derive a conclusion from the information or the data." Without reviewing the correctness of those rulings, we are satisfied that if correct they formed an adequate basis for the trial court to deny admission of the documents into evidence. *See* Va. R. Evid. 2:402, 2:403. Accordingly, these grounds form a separate and independent basis to affirm the trial court's ruling excluding the evidence, and we will not disturb the ruling on appeal.

2.  Emergency Physicians cite no authority in support of their interpretation of the jury instructions as relating to the trial court's denial of admission of medical records and therefore waive the argument.

Emergency Physicians also argue that the trial court's exclusion of these medical records was highly prejudicial because their expert witnesses testified that they had relied on those records in forming their opinions and therefore "[p]recluding admission of the medical records was thus akin to striking portions of the experts' testimony . . . ." Rule 5A:20 requires authority in support of arguments to be cited on brief. Here, no authority for their proposition is cited, and therefore the argument is waived. *See Farmer v. Commonwealth*, 62 Va. App. 285, 295 (2013).

E. *Assuming without deciding that the trial court erred in refusing admission of the audit trail, it was harmless error.*

Emergency Physicians next argue that the trial court committed reversible error in refusing admission of a document generated reflecting audit trails related to Hanger's medical records. We disagree.

Assuming without deciding that the trial court did abuse its discretion and should have admitted the audit trail, we find that it would not have had any impact on the outcome of the case and would be only harmless error. "In a civil case, the erroneous exclusion of evidence is reversible error when the record fails to show plainly that the excluded evidence could not have affected the verdict. Thus, [appellate courts] consider the potential effect of the excluded evidence in light of all the evidence that was presented to the jury." *Barkely v. Wallace*, 267 Va. 369, 374 (2004) (citing *Pace v. Richmond*, 231 Va. 216, 226 (1986)); *see also Commonwealth v. Proffitt*, 292 Va. 626, 642 (2016).

Emergency Physicians argue that admission of the audit trail was relevant in demonstrating that Hanger's primary care provider had been sent the blood testing information therefore meeting the standard of care. However, Emergency Physicians elicited testimony from two expert witnesses that, in their opinion, based on their review of the records, Hanger's

primary care provider had been provided the emergency room documentation. It appears from the record that Emergency Physicians sought to introduce the audit trail to establish this fact, but the audit trail at best, if decipherable, would have only been cumulative evidence consistent with their two medical experts' testimony. Since the jury heard that expert testimony and still found that Emergency Physicians violated the standard of care, we can only conclude that this cumulative evidence would not have created a different result.

F. *The trial court did not err in refusing defense Jury Instruction D.*

Emergency Physicians next argue that the trial court erred in rejecting their proffered Jury Instruction D. We disagree.

The Court "review[s] a trial court's decision to refuse a jury instruction for abuse of discretion." *Payne v. Commonwealth*, 65 Va. App. 194, 203 (2015) (quoting *King v. Commonwealth*, 64 Va. App. 580, 586 (2015) (*en banc*)). Its "responsibility in reviewing jury instructions is 'to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises.'" *Hilton v. Commonwealth*, 293 Va. 293, 302 (2017) (quoting *Payne v. Commonwealth*, 292 Va. 855, 869 (2016)). "[W]hether an instruction 'accurately states the relevant law is a question of law' that the appellate court reviews *de novo*." *Banks v. Commonwealth*, 67 Va. App. 273, 281 (2017) (quoting *Sarafin v. Commonwealth*, 288 Va. 320, 325 (2014)).

"A litigant is entitled to jury instructions supporting his or her theory of the case if sufficient evidence is introduced to support that theory and if the instructions correctly state the law." *Schlimmer v. Poverty Hunt Club*, 268 Va. 74, 78 (2004) (citing *Price v. Taylor*, 251 Va. 82, 85 (1996); *Bowers v. May*, 233 Va. 411, 413-14 (1987); *Hodnett v. Friend*, 232 Va. 447, 452 (1987); *H.W. Miller Trucking Co. v. Flood*, 203 Va. 934, 937 (1962)).

Emergency Physicians offered the following instruction:

> If you believe from the evidence that the injury to Patricia Hanger might have resulted from either of two causes, for one of which Dr. Raines might have been responsible and for the other of which the Dr. Raines was not responsible, and if you are unable to determine which of the two causes occasioned the injury complained of, then the plaintiff cannot recover.

Since the proffered jury instruction articulates the law correctly, the only inquiry left for the trial court was whether sufficient evidence in support of Emergency Physicians' theory that another superseding cause independent of their action or inaction could have caused the chain of events leading to Hanger's TBI.

Emergency Physicians argue that evidence establishing that Hanger may have tripped over an air vent cover was admitted and that this formed a sufficient evidentiary basis for their requested jury instruction. However, since Emergency Physicians make this argument for the first time on appeal, we will not consider this argument. Rule 5A:18; *Mastin v. Theirjung*, 238 Va. 434, 439 (1989); *Southers v. Price*, 211 Va. 469, 471-72 (1971); *Taylor v. Turner*, 205 Va. 828, 832-33 (1965). Further, Emergency Physicians, on appeal, have abandoned the argument actually made in support of Jury Instruction D to the trial court, that an act or omission by Hanger's primary care doctor might have been a superseding intervening cause of Hanger's injury. In their reply brief, Emergency Physicians expressly state: "[t]he alternate cause was not another healthcare provider's negligence, but rather was a simple slip, trip, or stumble on the part of . . . [Hanger] . . . ." Therefore, we will not consider this abandoned argument. Rule 5A:20.

G. *The trial court did not err in refusing to take corrective action regarding argument on rebuttal that Tidewater, PLC failed to send a corporate representative to trial.*

Emergency Physicians next claim that the trial court erred in not taking corrective action after counsel for Hanger argued during closing that Tidewater, PLC failed to send a corporate representative to trial. We disagree.

"The making of improper statements in argument is reversible error, where such statements are so impressive as to remain in the minds of the jurors and influence their verdict." *Kitze v. Commonwealth*, 246 Va. 283, 288 (1993) (quoting *McLane v. Commonwealth*, 202 Va. 197, 205 (1960)). "[A] trial court can remedy a situation that would otherwise warrant a new trial by sustaining an objection and instructing the jury 'to disregard the improper argument.'" *Pollino v. Commonwealth*, 42 Va. App. 243, 248 (2004) (quoting *Velocity Express Mid-Atlantic, Inc. v. Hugen*, 266 Va. 188, 198 (2003)). "However, if '*counsel persists in such argument after the admonition of the court*, or if it appears that the [prejudicial] influence of the argument was probably not wholly removed by the court's action' a new trial may be appropriate." *Velocity Express Mid-Atlantic, Inc.*, 266 Va. at 198 (alteration in original) (quoting *Maxey v. Hubble*, 238 Va. 607, 614-15 (1989)). If an "objection to . . . alleged improper argument is not sustained by the circuit court, a new trial is appropriate if that court erred in overruling the objection and that error resulted in prejudice to the complaining party." *Id.* (citations omitted).

Hanger's counsel, during closing argument, commented that: "as a company in the trial, [Tidewater, PLC] had a right to be here and have a representative sit at that table this entire trial, and they didn't have a representative come to this trial." Counsel for Emergency Physicians objected and informed the trial court that Dr. Raines was there in both her personal capacity and as a corporate representative of Tidewater, PLC. The trial court directed counsel for Emergency Physicians that he was free to address this matter in his closing. Hanger's counsel also noted that Dr. Raines was no longer working for Tidewater, PLC. For the first time on brief, Emergency Physicians also take issue with a statement made by Hanger's counsel during rebuttal that no witness from Tidewater, PLC testified. Since counsel for Emergency Physicians failed to object to the rebuttal argument at trial, we will not consider it here. Rule 5A:18.

In reviewing the record, it is not clear whether Dr. Raines was acting as a corporate representative of Tidewater, PLC. She was not introduced to the trial court nor to the jury by counsel in that capacity either during the opening statements or throughout the trial. It is clear, however, that assuming without deciding that she was present in that capacity and that the trial court erred in failing to take any corrective action, Emergency Physicians have failed to either allege or prove how the comment objected to was prejudicial. Therefore, we do not find any reversible error since any error would be harmless. *See Spruill v. Garcia*, 298 Va. 120, 127-28 (2019).

H. *The trial court did not err in permitting Hanger to attend the trial nor did it err in permitting counsel for Hanger to argue as to his client's medical condition during closing statements.*

Emergency Physicians assert that the trial court erred in permitting Hanger to attend the trial and further in permitting her counsel to provide unsworn, impermissible, and improper testimony during closing statements. We disagree.

1. The trial court did not err in allowing Hanger to appear at trial.

First, Emergency Physicians merely assert: "[o]ver objection, the trial court allowed [Plaintiff] to be physically 'presented' to the jury in a wheelchair wearing dark glasses." Emergency Physicians offer no argument beyond this mere assertion and therefore it is waived. Rule 5A:20(e), *Farmer*, 62 Va. App. at 295.

2. The trial court did not err in sustaining in part and denying in part Emergency Physicians' objections to Hanger's counsel commenting in closing regarding the current physical condition of Hanger.

Second, Emergency Physicians argue that the trial court permitted Hanger's counsel to give unsworn, improper, and impermissible testimony during closing argument. We disagree.

As discussed above, "[t]he making of improper statements in argument" requires reversal "where such statements are so impressive as to remain in the minds of the jurors and influence

- 23 -

their verdict." *Kitze*, 246 Va. at 288 (quoting *McLane*, 202 Va. at 205). However, a new trial is not required when the "trial court . . . sustain[s] an objection and instruct[s] the jury 'to disregard the improper argument.'" *Pollino*, 42 Va. App. at 248 (quoting *Velocity Express Mid-Atlantic, Inc.*, 266 Va. at 198).

During his closing argument on rebuttal, Hanger's counsel showed a slide which reflected that Hanger had not testified because she did not remember the injury due to the TBI. Hanger's counsel also verbally stated:

> On March 28, 2017, Pat Hanger's life changed forever, and I told you it was totally preventable, and there are temporary injuries in this world. There are aspects that may become permanent when you talk about personal injuries, and there are catastrophic and permanent injuries, and the category we are in in this case is catastrophic and permanent.

Counsel for Emergency Physicians objected, and the trial court sustained the objection, excluded the slide, and instructed the jury to disregard it. The trial court also advised Hanger's counsel "you may argue what, in good faith, you believe the evidence in the case may have disclosed what reasonable inferences you, in good faith, believe, if any, the jurors can draw from the evidence in the case." Hanger's counsel did go on to discuss the injuries suffered by his client but did not state that she could not remember the injury due to the TBI, nor did Emergency Physicians further object to his comment regarding her injuries.

The trial court properly sustained the objection as to the slide and provided a curative instruction, and the record gives no indication that the instruction was disregarded by the jury. As discussed above, Hanger had presented evidence of her injuries, and therefore the trial court did not abuse its discretion in allowing her counsel to make fair comments on that evidence.

I. *The trial court did not err in refusing to admit into evidence or allow impeachment with comments attributed to Kurt which appear in the medical record.*

Emergency Physicians argue that the trial court abused its discretion in excluding from evidence comments allegedly made by Kurt and written in his wife's medical records by a nurse. We disagree.

1. Emergency Physicians have not assigned error to each reason for which the trial court refused admission of the statements.

Emergency Physicians argue that the trial court erred in finding that the rule against hearsay precluded the statement's admission. However, the trial court excluded the statement on grounds of hearsay and speculation. As explained above, "[i]t is well-settled that a party who challenges the ruling of a lower court must on appeal assign error to each articulated basis for that ruling." *Manchester Oaks Homeowners Ass'n, Inc.*, 284 Va. at 421 (citing *United Leasing Corp.*, 247 Va. at 307-08). Since Emergency Physicians have not assigned error to the trial court's ground of speculation, and because speculation, if correct would be adequate grounds for the trial court to exclude the evidence, we decline to address the argument.

2. The trial court did not err in refusing to allow Emergency Physicians to use the statements of Kurt Hanger in question during impeachment.

Emergency Physicians also argue that the trial court abused its discretion in not allowing them to use the alleged statement of Kurt included in the medical records to impeach Kurt through a prior inconsistent statement. Since they cite no authority in support of their contention that they should have been permitted to use the statements for impeachment, we therefore decline to address it. Rule 5A:20(e), *Farmer*, 62 Va. App. at 295.

J. *The trial court did not err in allowing Hanger's counsel during closing to display and refer to a slide presenting a "snowball" effect argument and to argue that Emergency Physicians should be liable for the actions of Hanger's primary care physician.*

Emergency Physicians argue that the trial court erred in allowing counsel for Hanger to argue that a "snowball" effect occurred beginning with their treatment which ultimately led to

her injury.  However, Rule 5A:20 requires authority in support of arguments to be cited in brief. Here, Emergency Physicians cite no authority in support of their argument, and therefore it is waived.  *See Farmer*, 62 Va. App. at 295.

### III. CONCLUSION

For the foregoing reasons, we affirm the judgment of the trial court.

*Affirmed.*