COURT OF APPEALS OF VIRGINIA

Present:  Judges Huff, O'Brien and AtLee
Argued at Lexington, Virginia

LAURA GILMAN

v.        Record No. 1455-22-3

LYNCHBURG DEPARTMENT OF
  SOCIAL SERVICES

GEORGE GILMAN, SOMETIMES KNOWN AS
  GEORGE MARVIN GILMAN

v.        Record No. 1482-22-3

LYNCHBURG DEPARTMENT OF
  SOCIAL SERVICES

MEMORANDUM OPINION[*] BY
JUDGE GLEN A. HUFF
AUGUST 29, 2023

FROM THE CIRCUIT COURT OF THE CITY OF LYNCHBURG
Michael R. Doucette, Judge

(Michael C. Keenan; Michael Crawford Keenan, LLC, on brief), for
appellant Laura Gilman.  Appellant submitting on brief.

(James J. Angel, on brief), for appellant George Gilman.
Appellant submitting on brief.

Kathryn Laura Jordan Thomas, Assistant City Attorney (David E.
Mass, Guardian ad litem for the minor children, on briefs), for
appellee.

Laura Gilman ("mother") and George Gilman ("father") separately appeal the circuit court's

orders terminating their parental rights to three of their children.[1]  Mother argues that the circuit

---

[*] This opinion is not designated for publication.  *See* Code § 17.1-413(A).

[1] Although mother and father appeal separately, their appeals involve common facts,
proceedings, and issues of law, so this Court consolidates them for purposes of this decision.  *See*
*Bennett v. Commonwealth*, 8 Va. App. 228, 229 n.1 (1989).

court erred in admitting a psychologist's testimony and report concerning mother's parental capacity. She also contends the circuit court erred in finding the evidence sufficient to support the termination of her parental rights under Code § 16.1-283(B) and (C)(2). Father likewise asserts that the evidence did not support termination of his parental rights under the same subsections. Finding no error, this Court affirms the circuit court's judgments.

BACKGROUND[2]

"On appeal from the termination of parental rights, this Court is required to review the evidence in the light most favorable to the party prevailing in the circuit court," here, the Lynchburg Department of Social Services (the "Department"). *Yafi v. Stafford Dep't of Soc. Servs.*, 69 Va. App. 539, 550-51 (2018) (quoting *Thach v. Arlington Cnty. Dep't of Hum. Servs.*, 63 Va. App. 157, 168 (2014)).

Mother and father are the biological parents to minor children L.R.G., E.E.G., and L.L.G.[3] The Department first became involved with the family in 2016 after the Gilmans sought services for employment, housing, childcare, food stamps, and Medicaid. In 2017, the Department received reports alleging that father and mother had "spanked" L.R.G. as a form of "physical discipline." Both parents admitted to spanking the child but did not think that they left a mark. In March 2018, the Department received a report of physical neglect regarding E.E.G. arriving at school dirty and wearing "filthy" clothes.

---

[2] The records in these cases were sealed. Nevertheless, the appeals necessitate unsealing relevant portions of the records to resolve the issues mother and father have raised. "To the extent that this opinion mentions facts found in the sealed record, we unseal only those specific facts, finding them relevant to the decision in this case. The remainder of the previously sealed record remains sealed." *Levick v. MacDougall*, 294 Va. 283, 288 n.1 (2017).

[3] This Court refers to the children involved here by their initials to protect their privacy. Mother and father have another child, P.G., who was 18 months old at the time of the circuit court hearing and not subject to these appeals.

In July 2018, the family was evicted from their apartment for failure to pay the rent. They moved into another apartment with father's sister. In November 2018, the Department received another report of physical neglect, alleging that the apartment where the Gilmans were living was "filthy" and had a "significant" bed bug infestation. The family then moved in with a friend.

On January 11, 2019, the Department received a report regarding ongoing hygiene concerns with E.E.G. because he attended school with dirty clothes and did not have any extra clothing at school, despite "multiple" requests to mother and father to provide extra clothes. After a home visit, the Department and the Gilmans agreed to a safety plan, which required mother and father to provide beds for L.R.G. and E.E.G., engage in "safe sleep practices" for L.L.G., who was a baby and should not have been sleeping in the parents' bed, complete all mental health and behavioral services and recommendations, refrain from physical discipline "with an object," ensure the children had clean clothing, and provide extra clothing to the school. The Department further arranged for the family to receive intensive in-home services to facilitate their compliance with the safety plan.

During the following month, the Department received multiple reports that E.E.G. continued to come to school in dirty clothes, that father was hitting L.L.G., and that L.L.G. was still sleeping in the parents' bed. The family also refused to cooperate with the recommended intensive in-home services. Mother claimed that those services did not occur because the family was in transition and did not have their own home. After reviewing these reports and receiving notification that the other tenants of the apartment wanted the Gilmans to leave, the Department determined that the current housing situation was not sustainable and advised mother and father that they could go to the Salvation Army shelter. The Department expressly told the Gilmans that, in order to comply with the safety plan, they could not go back to father's sister's home

because she had an ongoing case with child protective services. The Department also required the parents to take the children to a doctor because it appeared that the children had bug bites.

The next day, the Department learned that the family had not gone to the shelter; instead, they had stayed with father's sister, which was a direct violation of the safety plan. The Department petitioned to remove the children and place them in foster care because mother and father had not complied with the Department's requests and violated the safety plan.[4]

At the time of removal, L.R.G. was six years old, E.E.G. was four years old, and L.L.G. was approximately nine months old. L.R.G. and E.E.G. had Individualized Education Plans ("IEP") and day treatment at school. L.R.G. had been diagnosed with attention deficit hyperactivity disorder ("ADHD") and required medication. E.E.G. also had been diagnosed with ADHD but did not require medication. L.L.G. had been diagnosed with cystic fibrosis.[5]

The City of Lynchburg Juvenile and Domestic Relations District Court (the "JDR court") entered emergency and preliminary removal orders. The JDR court adjudicated that the children were abused or neglected and entered dispositional orders approving the Department's foster care plan. Mother and father were initially granted weekly supervised visits with the children at the Department's offices. After approximately six months, they were authorized to have unsupervised visits with the children in the parents' new home.[6]

In March 2020, the in-person visits stopped because of the COVID-19 pandemic, so the parents visited virtually with the children. During those virtual visits, father usually played video games instead of directly engaging with the children. The CASA worker tried to explain to

---

[4] The Department determined that there were no viable relative placements at the time.

[5] Mother had scheduled appointments for L.R.G. and E.E.G. to be tested for cystic fibrosis in July 2019, but by then, they were in foster care.

[6] Mother and father moved into the new home in August 2019 and continued living there during the entirety of the circuit court hearing in 2021.

father the importance of participating in the video visits, as opposed to playing video games during them, but he was not receptive.

While the children remained in foster care, the Department offered numerous services to the Gilmans, including counseling and parenting skills training with Brandi Stinnett. Despite indicating that "he did not feel like he needed services," father agreed to meet with Stinnett. Beginning in April 2019, Stinnett and father started working together, and she also observed both parents' interactions with the children. Stinnett found that the parents had "appropriate" interactions with the children by engaging in "child centered play" on their level. It was evident to Stinnett that the parents loved the children and the children loved the parents. Moreover, Stinnett had no concerns as to substance abuse or physical abuse within the family.

Stinnett spoke to each parent about issues they should correct. She commended mother's goal-setting skills, such as obtaining her driver's license, and identifying what she needed to do to accomplish her goals, such as scheduling an appointment with the Department of Motor Vehicles. Mother, however, acknowledged that she lacked "consistent motivation" and struggled with keeping appointments and maintaining a clean house. Sometimes the home was not clean when Stinnett visited, but a few days before the hearing in the JDR court, Stinnett visited the home and found it to be clean, aside from a few dirty dishes.

Stinnett "consistently discussed" with father issues regarding the cleanliness of the home and budgeting. Father told Stinnett that he earned "the money" and mother was responsible for paying the bills. Stinnett found that father could be very "creative" with his problem-solving skills and he was "nurturing" with mother. Mother and father worked well together and did not raise their voices with one another. Nevertheless, Stinnett also witnessed father "over stimulating" the children and not following through with consequences. Father "struggle[d]" with balancing the children's needs at home because one child needed assistance with school

while the toddler was "mobile" and demanding attention. They also discussed father's need to engage with the children's medical professionals and teachers.

Based on mother's history and Stinnett's reports, the Department required mother to be evaluated for trauma and counseling. In August 2019, Dr. Nina Dillon evaluated mother and determined that she was "appropriate for services" because her "significant amount of anxiety" met the criteria for post-traumatic stress disorder. Dr. Dillon and mother met weekly before Dr. Dillon left the agency for another position in the summer of 2020. During those sessions, Dr. Dillon and mother worked on "processing" mother's past childhood trauma, as well as "managing the stress of her children being in foster care and the birth of a new child."[7]

In February and May 2020, mother's anxiety became "so intense" that she sought help at the emergency room. Father "thought she wasn't feeling good" but did not accompany her to the emergency room because he needed to sleep before he went to work. At the hearing in the JDR court, father testified that mother was handling her anxiety "well" and took medication as necessary, which was "not very often."

Dr. Dillon recommended that mother see a psychiatrist for medication, but mother never made an appointment while they worked together.[8] Dr. Dillon became concerned that mother was using the emergency room to "deal" with her anxiety, as opposed to getting treatment on an outpatient basis from a psychiatrist.

By the end of their sessions together, Dr. Dillon found that mother's progress had been "minimal." Dr. Dillon questioned mother's ability to manage her anxiety and recognize how her childhood trauma impacted her own parenting. According to Dr. Dillon, mother had a "tendency

---

[7] P.G. was the youngest child.

[8] At trial, mother claimed that she was under the care of a psychiatrist and took medication "as needed."

to minimize or deny issues that needed to be addressed." Mother also lacked a support system and often felt like "all of the responsibilities to parent and manage the household were falling on her" because father was "detached." Despite mother's anxiety, Dr. Dillon had no concerns about her ability to parent her youngest child, P.G.

As Dr. Dillon transitioned from her practice, mother worked with another counselor on parenting skills, community resources, budgeting, and communication with case workers. They also discussed mother's involvement with school meetings and the children's doctor appointments. Because finances were an issue, the counselor helped mother identify community resources available to help with paying utility bills and rent. They also reviewed mother's monthly budget, which reflected a deficit each month, and discussed options for eliminating some expenses. After visiting the Gilmans' home, the counselor stressed the importance of keeping it clean, especially once P.G. was mobile and placing items in her mouth.

In September 2020, the Department resumed the in-person visits, and the children stayed with their parents from Thursday through Sunday each week. Although the Department expected the parents to ensure that the children attended their appointments, the children missed some of their therapeutic appointments on Fridays when they were with mother and father. Mother canceled some of those appointments because the children were "misbehaving" or "napping."

The children's school had made special accommodations to send schoolwork home with L.R.G. and E.E.G. over the weekends because the parents did not live in the same school district, thereby causing the children to miss school on Fridays. The school expected the work to be completed and turned in on Mondays. The CASA worker observed L.R.G. working at her desk initially, but "that routine very quickly went away." Although mother and father tried to help the children with their schoolwork, the children's teachers found that "most of the time" the work

was "incorrect," and the children had to complete it again. On Mondays, after having visited with their parents over the weekend, both E.E.G. and L.R.G. had a "hard time" concentrating on their schoolwork. E.E.G. also exhibited "disrespectful" behavior and L.R.G. was often "very spaced out on Mondays."

By late 2020, mother and father were delinquent in their rent and utilities payments, but they received financial assistance from Interfaith Outreach Association to pay their debt.

On March 17, 2021, the JDR court terminated both parents' parental rights to L.R.G., E.E.G., and L.L.G.[9] Mother and father appealed separately to the circuit court. Over the course of two days—July 22, 2021, and December 16, 2021—the parties presented evidence and argument on the issue of termination in the circuit court. The Department presented evidence that it initially removed the children to foster care due to "inadequate" housing and the parents' failure to maintain a clean home, which led to the children having lice, scabies, and dirty clothes.

The Department's evidence also showed that, even after the parents moved into a new home in August 2019, the children had "difficulty with truancy" and the parents failed to attend school meetings. After approximately three years, the Department remained concerned that both mother's and father's parental capacity had not improved.

Furthermore, as of the first day of trial in July 2021, mother and father continued to struggle with housing instability and had not paid their rent in six months. Mother admitted that she was responsible for the finances and explained that the family income was spent on transportation, food, utilities, and "household stuff." After paying for those necessities, "there

---

[9] Despite termination of their parental rights by the JDR court, mother and father continued to have overnight visits with the children every other weekend from Saturday to Sunday.

wasn't much left over for rent." Mother testified that she had applied for "rent relief" and sought additional hours at work to pay the rent owed.[10]

Mother worked part-time for a catering company, and her work hours varied weekly. For more than two years, father worked full-time in "janitorial housekeeping." Neither parent had a valid driver's license.[11] Before the children entered foster care, the family had a van, but the parents sold it when they could no longer afford it.

The parents' lack of transportation concerned the Department because of the children's numerous doctor appointments. L.R.G. participated in "behavioral" therapy, and E.E.G. and L.L.G. required speech therapy. After entering foster care, all three children were tested for cystic fibrosis. While L.R.G. tested negative, E.E.G. tested positive for cystic fibrosis, and L.L.G. had "[c]ystic [f]ibrosis related metabolic syndrome." L.L.G. needed medication and breathing treatments every morning and evening. L.L.G. must visit the doctor every three months. E.E.G. has "a pretty significant daily burden of care" that includes multiple respiratory medications, breathing treatments, and a "therapy vest to help move the thick mucus out" of his lungs. Due to his cystic fibrosis, E.E.G.'s weight fluctuates and must be monitored every four to six weeks.

Kristi Gott, a pediatric nurse practitioner at the cystic fibrosis clinic at the University of Virginia, recalled mother bringing L.L.G. to appointments before he entered foster care. Mother, however, missed seven appointments between June and December 2018. Mother participated via

---

[10] By the second day of trial in December 2021, mother and father had used "Covid funds" to pay the arrears owed through August; then, they paid three months of rent, so they were no longer in arrears. Even though the rent payments were due on the first day of the month, mother and father had not paid the December rent payment as of December 16, 2021. Mother testified that she planned to use their next paychecks to pay the rent.

[11] Mother had never obtained a driver's license and father's license was suspended for an "[u]ninsured driver fee."

telephone for three out of six appointments after the children entered foster care. Mother admitted to missing other appointments because of a lack of transportation and because she was busy with work and caring for P.G. Father had not participated in any of the medical appointments.

Vicki Putt, a special education teacher who had worked with L.R.G. and E.E.G., testified that, although mother had attended E.E.G.s' eligibility meeting, neither mother nor father attended the children's subsequent IEP meetings. Putt explained that if they had requested, either parent could have participated in the meetings.

Father testified that the children entered foster care because of housing, neglect, and their dirty clothes. He acknowledged that having the family stay with his sister violated the safety plan agreement he had signed, but he claimed that he did not "really have much choice."

When asked at trial about the children's needs, father acknowledged that E.E.G. and L.L.G. had cystic fibrosis and that E.E.G. required more medication than L.L.G. for his condition. Father also recognized that L.R.G. and "one other one" had "a touch of . . . hyperactive disorder" and required medication. Generally, father did not attend the children's medical appointments because he was working. He was "not aware" of any parent-teacher conferences and did not know about the "IEP specific accommodations." Nonetheless, father wanted the children to be returned to his and mother's care. He claimed that he and mother could "[e]asily" figure out the children's school schedule, bus routes, and necessary daycare. He also asserted that he could care for all four children by himself because he had done so in the past when mother was working.

On the first day of trial, the circuit court questioned whether father and mother were vaccinated against COVID-19. Neither parent was vaccinated.[12] During the second day of trial, mother testified that she was allergic to an ingredient in the COVID-19 vaccine. She explained that her allergist was unwilling to provide her with a note verifying her allergy, but she believed that she could get one from one of her other doctors. Even though the doctor's note was necessary to see her children, mother said that she had "not gotten the time to go get the note" because she had been "busy with work" and with P.G.'s "stuff." Mother testified that father did not want the vaccine because he was concerned about the side effects; she also said that colds and viruses did not linger "in his system long" and the vaccine did not "guarantee him not to get something worse." After speaking with E.E.G.'s doctor, mother claimed she now understood the risk to the children and declared she was willing to get the vaccine if it did not cause her an allergic reaction. She further explained that father was also willing to get the vaccine if "that's the only thing preventing [the children] from coming home."

During the second day of trial, the Department presented evidence from Dr. Timothy H. Barclay, a clinical psychologist who had evaluated mother's and father's "capacity to parent" in October 2019 and then prepared an addendum to his report in January 2021.

Dr. Barclay diagnosed father with "unspecified adjustment disorder and attention deficit hyperactivity disorder inattentive type." Initially, Dr. Barclay determined that father's parenting capacity reflected "low average to moderate levels of parental functioning." Father did not exhibit any symptoms of substance abuse or "severe psychosis." Barclay recommended individual therapy and parenting classes. Dr. Barclay also stated that, after he learned that father

---

[12] After learning of the parents' vaccination status, the Department had stopped the in-person visits with the children because mother and father "did not seem to grasp the severity of potential risk and harm that could cause the children." The parents, however, continued to maintain contact with the children by participating in weekly telephone calls.

had attended "parenting training" but was "not making progress," he concluded that father lacked insight "to the point where he believes himself to be a functional parent." Barclay especially questioned father's ability to parent a special needs child. The circuit court admitted Dr. Barclay's evaluation of father.

After the initial testing, Dr. Barclay diagnosed mother with "attention deficit disorder inattentive type and an unspecified anxiety and depressive disorder." Dr. Barclay found that mother's "individual capacity to parent in the initial assessment was scattered" and recommended that she participate in individual therapy and parenting classes.

When mother failed to comply with his recommendations, Dr. Barclay questioned her "ability to function and parent children," especially after learning that the children had "special needs." Dr. Barclay expressed concern about "the stability of the home environment" and the "possibility of [the family] being homeless again." He was also concerned that mother and father were "not being consistent with following up on care for the children, school meetings, [and] doctor's appointments." On cross-examination, Dr. Barclay explained that his opinion regarding mother's parental capacity arose from a "gross lack of in[sight] and understanding the gravity of the situation." Dr. Barclay further opined that mother was "going to struggle greatly" with the children, even though it was evident that she loved them.

Mother objected to the admission of Dr. Barclay's evaluation of her and argued that it was "fatally flawed." Mother argued that the report reflected a "legal opinion as to the best interest of the children" and expressed findings and opinions "in terms of possibilities, not in terms of probabilities." The circuit court overruled mother's objection and stated that the parties could argue what weight, if any, the court should assign the report. The circuit court further found that Dr. Barclay was offering a "factual conclusion," rather than a legal one, when his report stated that, after reviewing mother's "scores" and the new information in the addendum,

"it would appear in the best interest of the children not to be returned to [the parents'] care particularly with the specific needs child." The circuit court admitted Dr. Barclay's evaluation of mother.

On cross-examination, mother questioned Dr. Barclay about his evaluation of the best interest of the children. Dr. Barclay testified that mother demonstrated "poor ability to communicate effectively" and was "very depend[e]nt on other people to help her parent." He also explained that, based on her history and testing, she had "a tendency to make bad decisions." Mother renewed her objection to Dr. Barclay's opinion and argued that his opinions did not follow legal standards because they were "possibilities, not probabilities." The circuit court overruled mother's objection.

The Department also presented evidence that the children were doing well in their foster home. The foster mother testified that the children had been in her home since February 2019. When the children arrived at the foster home, they were dirty and not dressed in weather-appropriate clothes. The children's legs and arms were "covered in red dots," which doctors determined were bed bug bites and scabies. L.R.G. had been prescribed Adderall, but since being in foster care, the doctors determined that it "did not agree with her." After the doctors prescribed a new medication, L.R.G. was "a different child" with "significant[ly]" improved behavior. E.E.G.'s behaviors also improved as the foster parents advocated for more services for him within the classroom and outside treatment for his "speech difficulties."[13] While in foster care, L.L.G. started preschool, where he has an IEP for speech.

The foster mother testified that when the children visited their parents from Thursday through Sunday, they returned "hyper" and "wound up." Although they were in "good physical appearance," the children's feet were "really dirty." The foster mother sent the children's

---

[13] E.E.G. was diagnosed with speech apraxia.

medications with them for those parental visits; the nebulizer, however, was overheating "a lot" due to being left on for too long at the parents' house and had to be replaced.

At the conclusion of all the evidence, the Department recalled Stinnett for her expert opinion of mother's and father's ability to parent their children. Stinnett identified the parents' "laissez-faire attitude towards things" as being the "significant barrier" to the children not returning home. She noted that the parents wait for "things [to] take their course instead of being proactive to make things happen," which could be a safety concern considering the children's health issues. Stinnett was unaware of any additional services that could be provided to remedy the situation.

Following all the evidence, the Department argued that even though no "single fact" in this matter was "horrific," the totality of the circumstances showed "a pattern of neglect." The Department emphasized that the children had special needs and the parents could not be passive with their care.[14]

In her own arguments, mother emphasized the love between her and the children. She also stressed that the children should be considered individually rather than collectively. She further argued that Dr. Barclay's evaluation included language like "may and possibly" and did not "rise to the legal threshold, certainly not clear and convincing evidence," to prove that termination of her parental rights was in the children's best interest.

Father noted that the children entered foster care because of concerns about homelessness. The parents, however, had been living in the same residence "for the majority of the case." Father was employed and had complied with the Department's request to be evaluated by Dr. Barclay and participate in counseling with Stinnett. Father explained that there were "no

---

[14] The Department acknowledged that there was no concern about P.G. being in the parents' custody "at this point" because P.G. was "healthy with no diagnosis."

incidents" when the children visited with the parents from Thursdays to Sundays and there was no concern about the parents raising P.G.

After hearing the parties' arguments, the circuit court took the matter under advisement. On September 9, 2022, the circuit court entered orders terminating mother's and father's parental rights under Code § 16.1-283(B) and (C)(2). Both parents appeal those judgments separately.

ANALYSIS

I. Mother's Appeal

Mother argues that the circuit court erred in admitting Dr. Barclay's report and testimony about her parental capacity. She also challenges the sufficiency of the evidence to support terminating her parental rights.

A. Expert Witness and Report

"The decision whether to admit expert testimony rests within the sound discretion of the trial judge, and therefore we will not reverse unless the trial court abused its discretion." *C. Farrell v. Warren Cnty. Dep't of Soc. Servs.*, 59 Va. App. 375, 429 (2012). "[O]nly when reasonable jurists could not differ can we say an abuse of discretion has occurred." *Stark v. Dinarany*, 73 Va. App. 733, 746 (2021) (quoting *Galiotos v. Galiotos*, 300 Va. 1, 11 (2021)).

The circuit court recognized Dr. Barclay as an expert "in clinical psychology dealing with . . . parenting capacity." Dr. Barclay testified about his evaluation of mother and his recommendations. After his initial evaluation, Dr. Barclay opined that mother's parenting capacity was "scattered," but he determined that the children "could be returned" to her care if she followed through with the Department's recommendations and "favorably" completed parenting classes. Approximately one year later, however, Dr. Barclay prepared an addendum in which he opined that "it would appear in the best interest of the children to not be returned" to mother's care because of the children's special needs, mother's non-compliance with the

- 15 -

Department's requirements, and her lack of demonstrated improvement. Mother objected to the admission of his report and addendum. The circuit court overruled her objection and admitted the documents into evidence.

Mother emphasizes that throughout his report and addendum, Dr. Barclay used language that reflected possibilities, not probabilities. For instance, Dr. Barclay reported that mother "*may occasionally* show bad judgment" and was "*somewhat* immature and impulsive." In addition, mother argues that Dr. Barclay's addendum was "not based on a solid factual foundation," but instead on information from the Department that was "incorrect, exaggerated, irrelevant or false."

Expert testimony "is admissible in civil cases to assist the trier of fact, if the testimony meets certain fundamental requirements, including the requirement that it be based on an adequate factual foundation." *C. Farrell*, 59 Va. App. at 429 (quoting *Countryside Corp. v. Taylor*, 263 Va. 549, 553 (2002)). "In any civil action any expert witness may give testimony and render an opinion or draw inferences from facts, circumstances or data made known to or perceived by such witness at or before the hearing or trial during which he is called upon to testify." Code § 8.01-401.1. Expert testimony is "inadmissible if it is speculative or founded on assumptions that have an insufficient factual basis." *C. Farrell*, 59 Va. App. at 429 (quoting *John v. Im*, 263 Va. 315, 320 (2002)).

The record demonstrates that Dr. Barclay based his decision on his interview with mother and the results of her psychological tests.[15] He explained that "there was no need to do a second evaluation" because he had received "more information" from the Department that he used for

_____

[15] Those tests include the Wechsler Adult Intelligence Scale-IV (WAIS-IV), Stroop Word Color Test (SWCT), Comprehensive Trail-Making Test (CTMT), Test of Memory and Learning Second Edition (TOMAL-2), Minnesota Multiphasic Personality Inventory-2 (MMPI-2), and Family Assessment Measure-III: Self-Rating Scale (FAM-III).

his addendum. Mother's "past and . . . current history" had aligned with her testing, which helped Dr. Barclay formulate his opinions about her parental capacity. Mother questioned Dr. Barclay at length about his report and the information he received from the Department for his addendum. Dr. Barclay explained that his assessment of mother's personality did not change; however, his opinion on her ability to parent did because she had "time to rehabilitate herself" but failed to do so.

The circuit court found that Dr. Barclay had made a "factual conclusion" about mother's ability to parent the children based on her scores and the information he received. A doctor may provide testimony that was "factual in nature" and "explained the physician's impressions and conclusions formed." *Graham v. Cook*, 278 Va. 233, 244 (2009); *see also Pettus v. Godfried*, 269 Va. 69, 77-78 (2005) (holding that expert witness's testimony was "factual in nature because it served to explain the impressions and conclusions he reached while treating" the patient). Dr. Barclay's testimony was factual and necessary to explain his conclusions about mother's ability to parent her special-needs children. Thus, the circuit court did not abuse its discretion in admitting Dr. Barclay's report and his opinion about mother's parenting capacity.

B. Termination of Mother's Parental Rights

"On review, '[a] trial court is presumed to have thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests.'" *Castillo v. Loudoun Cnty. Dep't of Fam. Servs.*, 68 Va. App. 547, 558 (2018) (alteration in original) (quoting *Logan v. Fairfax Cnty. Dep't of Hum. Dev.*, 13 Va. App. 123, 128 (1991)). "Where, as here, the court hears the evidence *ore tenus*, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it." *Fauquier Cnty. Dep't of Soc. Servs. v. Ridgeway*, 59 Va. App. 185, 190 (2011) (quoting *Martin v. Pittsylvania Cnty. Dep't of Soc. Servs.*, 3 Va. App. 15, 20 (1986)).

Mother challenges the sufficiency of the evidence as to the termination of her parental rights.[16]  The circuit court found that clear and convincing evidence supported the termination under Code § 16.1-283(C)(2), which authorizes a court to terminate parental rights if:

> The parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed 12 months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

"[S]ubsection C termination decisions hinge not so much on the magnitude of the problem that created the original danger to the child, but on the demonstrated failure of the parent to make reasonable changes." *Yafi*, 69 Va. App. at 552 (quoting *Toms v. Hanover Dep't of Soc. Servs.*, 46 Va. App. 257, 271 (2005)).  "Considerably more 'retrospective in nature,' subsection C requires the court to determine whether the parent has been unwilling or unable to remedy the problems during the period in which [she] has been offered rehabilitation services." *Toms*, 46 Va. App. at 271 (quoting *City of Newport News Dep't of Soc. Servs. v. Winslow*, 40 Va. App. 556, 562 (2003)).

The Department's evidence focused primarily on the parents' lapses in meeting the children's special needs, including their diagnoses of ADHD, cystic fibrosis, and speech apraxia. Those medical conditions required specific routine medications and treatments.  Before the children entered foster care, mother missed seven appointments at the cystic fibrosis clinic in a six-month period.  After the children entered foster care, mother missed three out of six appointments.  Mother even canceled some appointments for frivolous reasons, such as when the

---

[16] In her opening brief, mother argues that father was not offered "adequate services" to remedy the conditions that required the children's continuation in foster care.  "[O]ne cannot raise third party rights." *Tackett v. Arlington Cnty. Dep't of Hum. Servs.*, 62 Va. App. 296, 325 (2013) (quoting *DePriest v. Commonwealth*, 33 Va. App. 754, 761 (2000)).  Thus, this Court will not consider mother's arguments regarding the adequacy of father's services.

children were "misbehaving" or "napping." Ultimately the Department felt that mother had not demonstrated an understanding of the need to prioritize the children's attendance at the appointments.

Mother also did not appear to fully understand or appreciate the children's educational needs. Each child had an IEP at school. Although mother attended E.E.G.'s eligibility meeting, she did not attend the children's subsequent IEP meetings. When visiting mother and father every Thursday through Sunday, the children missed school on Fridays. Although they were given the opportunity to complete the missed schoolwork over the weekend, the children frequently returned "incorrect" work that they had to redo. Mother admittedly was busy with work or with P.G. and could not accomplish all that needed to be done. Dr. Barclay ultimately expressed doubt over mother's ability to parent her special-needs children.

In addition, mother argues that her and father's "troubles have always been primarily financial in nature" and asserts that any "future risk of financial hardship has been virtually eliminated." Mother contends that if the children lived with them, they would have additional "financial help" because the children would qualify for social security disability and other services, such as food stamps.[17] Despite mother's claims, stable housing remained a concern throughout the time that the children were in foster care. After experiencing difficulties with finding housing, mother and father moved into a new home in August 2019. They soon became delinquent in their rent payments, and Interfaith Outreach Association paid their debt in December 2020. Mother and father again became delinquent on their rent payments. In 2021, they obtained rent relief and used "Covid funds" to pay their arrears. At the time of the circuit

---

[17] Mother and father had not applied for social security disability for all the children because they had been in foster care. L.R.G., however, had received social security disability for a period of time.

court hearing on December 16, 2021, they had not paid their December rent yet, even though it was due on the first day of the month.

Although mother had participated in the recommended services, such as counseling and Dr. Barclay's evaluation, the Department remained concerned about her lack of progress in meeting the children's special needs. As Stinnett testified, the parents' inability to be proactive and prioritize impacted the children's health and safety. By the second day of the trial, the children had been receiving necessary services in foster care for almost three years and mother still was not in a position to resume custody. "It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or her] responsibilities." *Tackett v. Arlington Cnty. Dep't of Hum. Servs.*, 62 Va. App. 296, 322 (2013) (alteration in original) (quoting *Kaywood v. Halifax Cnty. Dep't of Soc. Servs.*, 10 Va. App. 535, 540 (1990)). Considering the totality of the circumstances, the circuit court did not err in terminating mother's parental rights to L.R.G., E.E.G., and L.L.G. under Code § 16.1-283(C)(2).

"When a lower court's judgment is made on alternative grounds, this Court need only determine whether any of the alternatives is sufficient to sustain the judgment." *Castillo*, 68 Va. App. at 574 n.9; *see also Fields v. Dinwiddie Cnty. Dep't of Soc. Servs.*, 46 Va. App. 1, 8 (2005) (affirming termination of parental rights under one subsection of Code § 16.1-283 and refusing to address termination of parental rights pursuant to another subsection). As the circuit court did not err in terminating mother's parental rights under Code § 16.1-283(C)(2), this Court need not review the termination of mother's rights under Code § 16.1-283(B).

## II. Father's Appeal

Father argues that the circuit court erred in terminating his parental rights under Code § 16.1-283(B) and (C)(2) because he participated in "all the services" required by the

Department. Acknowledging that housing was an initial concern, father stresses that he, mother, and P.G. had resided in the same home for "over one year" at the time of the circuit court hearing. He further notes that he had a full-time job, no criminal history, and no substance abuse history. Finally, he emphasizes that he and mother have been caring for P.G. "without any reported difficulty."

The trial court did not err in terminating father's parental rights under subsection (C)(2). Although father participated in the parenting capacity evaluation with Dr. Barclay and parenting skills counseling with Stinnett, he did not demonstrate an understanding of how his behavior and actions led to the continuation of foster care placement for the children. And despite participating in the services Stinnett offered, father told Stinnett that he did not think he needed any services.

Mother testified that most of the household and parenting duties fell on her because father was working. While P.G. did not have any special needs at the time of the circuit court hearing, L.R.G., E.E.G., and L.L.G. had specific needs to address their medical diagnoses and educational difficulties. Despite encouragement from Stinnett, father did not participate in the children's school or medical appointments. At trial, father was unaware of the children's educational accommodations and did not fully grasp the extent of the children's medical needs. As with mother, Dr. Barclay expressed doubt over father's ability to parent the children given their needs. In sum, while father participated in the recommended services, he ultimately did not meet the children's needs and thus failed to remedy substantially the conditions that required the children's continuation in foster care.

Moreover, as already discussed, the parents' lack of stable housing also became a recurring issue. Meanwhile, the children were doing well in foster care and receiving the necessary services their parents failed to provide. By the second day of the trial, the children had

been in foster care for almost three years, and father, like mother, still was not in a position to resume custody. *See Tackett*, 62 Va. App. at 322 ("It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or her] responsibilities." (alteration in original) (quoting *Kaywood*, 10 Va. App. at 540)). Considering the totality of the circumstances, the circuit court did not plainly err in terminating father's parental rights to L.R.G., E.E.G., and L.L.G. under Code § 16.1-283(C)(2).

As stated previously, "[w]hen a lower court's judgment is made on alternative grounds, this Court need only determine whether any of the alternatives is sufficient to sustain the judgment." *Castillo*, 68 Va. App. at 574 n.9. As such, this Court need not reach the question of whether father's parental rights also should have been terminated under Code § 16.1-283(B).

CONCLUSION

For the foregoing reasons, the circuit court's rulings are affirmed.

*Affirmed*.